# SUPERVISOR AND ASSESSOR OF HENSLEY TOWNSHIP

## *v.*

# THE PEOPLE *ex rel.* David Bailey.

1. TOWNSHIPS—*apportionment of debts, etc., on division.* A subscription voted to a railway company by a town before an order for the division of the town, where there is no discretion left as to making the subscription and issuing of bonds in payment, constitutes an indebtedness within the meaning of the law requiring its apportionment on a division of the town, although the bonds may not have been issued until after the order for the division. The law embraces any contract, agreement or legal liability incurred, whether a present complete liability or one to ripen into such in the future.

2. And so a liability of a town to subscribe a sum of money to procure the location of the Industrial University in the county, had in pursuance of law, under a vote after the making of an order for a division of the town, but which was not to take effect until a day after the taking of the vote, is an indebtedness to be apportioned after the division of the town.

3. SAME—*division.* The board of supervisors can divide a township only at a regular meeting, and upon sixty days' notice; and an order for this purpose, that the separation or division shall not take effect until the next annual election of town officers, is authorized and is in accordance with the statute.

4. MUNICIPAL SUBSCRIPTION—*assurances to procure do not invalidate.* Assurances by the officers of a railway company, in writing, that if a vote by a town is in favor of subscription to its capital stock, the bonds will not be called for until satisfactory assurance is given of the completion of the road, can not be regarded as a fraud operating to induce an affirmative vote. And when such a vote is had, if the supervisor enters into a further agreement to issue but half of the bonds voted, on satisfactory assurances, this will not release a new town, formed out of part of the original town, from the payment of its just proportion.

5. SAME—*what is a corporate purpose.* Counties, towns and other municipal bodies might, under the old constitution, be invested with power to vote donations to secure the location and erection of an university, as this is a corporate purpose, within the meaning of the constitution.

6. SAME—*legality.* If the legislature authorizes a municipal corporation to vote a donation or subscription to secure the location and erection of a public building, a vote authorizing the same will create a legal liability. The courts can not inquire into the propriety or policy of such legislation.

Appeal from the Circuit Court of Champaign county; the Hon. A. J. Gallagher, Judge, presiding.

. Messrs. Somers & Wright, for the appellant.

Messrs. Sweet & Day, for the appellee.

Mr. Justice Walker delivered the opinion of the Court:

On a petition filed for the purpose, the court below awarded a writ of *mandamus* to compel the supervisor and assessor of the town of Hensley to join the supervisor and assessor of the town of Champaign in dividing property of the latter town, and in apportioning its indebtedness between the two towns. The proceeding was under the provisions of the 6th and 9th sections of article 3 of the Township Organization Law of 1861.

It appears that townships 19 and 20, up to the 11th day of September, 1866, were embraced in one township, and it was known as West Urbana. On that day, the board of supervisors of the county, on a petition filed for the purpose, divided the territory, and set off township 20 into a township by the name of Grant, but by a proviso annexed to this order the division was not to take effect until the first day of the following April. At the town election in that month, the new township organized by electing officers, and it has continued to so act to the present time. Subsequently to this division the new township has taken the name of Hensley, and the old one that of Champaign.

No objection to the legality of this division and organization is urged. It appears that a meeting of the supervisors and assessors of the two towns was held, after notice given, to divide the property of the old township, and apportion its indebtedness in accordance with the provisions of the statute, but the supervisor and assessor of appellant township denied that their township was liable to pay any portion of such indebtedness, and the effort to apportion failed, and thereupon this proceeding was instituted, and on a trial the court below held appellant liable

35—84th Ill.

to pay its proportion of the indebtedness, and awarded a peremptory writ to compel them to make the apportionment, and this appeal is prosecuted to reverse that judgment.

The indebtedness consists of $50,000 of bonds, one-half issued to the Monticello Railroad Company on a subscription for stock in the company, and the other half by bonds issued to Champaign county, to aid in securing the location of the Industrial University at Urbana, in that county.

It is admitted that the indebtedness to the railroad was voted at elections held in the township before it was divided, but the bonds were not issued until after the order was entered for the division, and that the bonds to the county were voted in March, after the order for the separation was entered, and before the new township elected officers.

It is first insisted, that this did not constitute an indebtedness—that the town was not indebted until the bonds were issued. To so hold, would be too narrow a construction of the statute. It might be, with equal propriety, said, there was no indebtedness until the money became due—and yet it would almost be a perversion of terms to so hold. The statute manifestly intended that all liabilities, absolute or contingent, so they exist at the time of the separation, shall be apportioned This is fair, reasonable, and simply just, and the word "debts" or "indebtedness," in its general acceptation, means liabilities, without regard to their technical form. From the injustice and wrong that would result from any other interpretation, we are of opinion that the term was used by the General Assembly in its usual, broad and comprehensive sense, and that it would embrace any contract, agreement or legal liability which had been incurred, whether it was a present complete liability or should ripen into such in the future.

In this case a vote was taken, under and in pursuance of law, resulting in favor of issuing $25,000 of bonds of the township, with which to pay for an equal amount of stock in the railroad company; and the law made it the duty of the officers of the township to make a subscription and to issue the bonds. It was not left optional with them, under this law, to

subscribe or not, but it was declared to be a duty, on the vote resulting in favor of subscription. The township could, therefore, have been compelled to issue the bonds on a tender of the stock by the railroad company, and the giving satisfactory assurances of the completion of the road. This, then, was the liability of the township, both at the time the order of separation was made, and at the election in April, following—a liability imposed by a vote of the citizens of the whole town, those in the territory of Hensley, no doubt, participating and aiding in the imposition of the liability. If the construction of the road was a benefit to the inhabitants of the territory before the separation, a mere resolution, and the election of officers in the severed territory, would not, in the slightest degree, deprive them of these benefits. They undeniably enjoy them as fully in the two towns as they could have done united as one.

The citizens of Hensley must have known, when they voted to incur this liability, that they would be required to bear each his ratable proportion of the burthen, as the order was not passed to divide the territory of the township. If, however, they then anticipated the separation, we can not suppose they could have designed to obtain all of the benefits of the road, and to impose the burthen on the diminished population and territory of the old township from which they expected to separate. To have done so would have been unfair and unjust, and we will not presume they intended to so act.

It is urged that the president and secretary of the railroad company gave a written guaranty, that if the vote resulted in favor of subscription, the bonds would not be called for until satisfactory assurances should be given of the completion of the road, and that these assurances were, in some manner, a fraud on the voters. If so, we are wholly unable to see how it could have so operated. On the contrary, it shows the highest sense of official duty on the part of the supervisor to protect the people of his township from fraud and loss. He thereby placed the control of the bonds in his own power, that enabled him to prevent the issue of the bonds until he was satisfied the road would be completed, and the people of the township

obtain that for which they paid their money—the completion of the road. So far from seeing any objection to his action in this regard, we think it was fully warranted, and operated to the benefit of the inhabitants of the towns. Nor did it change their liability or form a new contract, but it only operated as a security that the company would perform their part of the agreement.

But, it is said that it induced persons to vote for the subscription. This may or may not be true. But what was the inducement to vote for the road? Manifestly, that it might be completed and the expected benefits obtained, and this only secured them in the realization of their expectations. It produced no injury, nor did it result in any loss.

It is again urged, that, subsequently, the supervisor entered into a further arrangement, by which he issued but one-half of the bonds on assurances of completion, and was to withhold, and did withhold, the other half until the road was completed, and that by this arrangement Hensley was released from paying any portion of this debt. We fail to comprehend why or on what principle it should. It was fully within the power of the supervisor to make the arrangement as a protection against loss, and if so, he had the power at the time the vote was taken, and which was had subject to the exercise of this power. If, however, no such power existed, then the arrangement was void, and he was required under the law by virtue of which the vote was had, and it was his duty, to issue the bonds when the stock was tendered and satisfactory assurances were given of the completion of the road, and he only did his duty under the law in issuing and delivering the bonds.

Had the bonds been issued and the road never been completed, we presume the conduct of the supervisor would have been condemned in much stronger terms by the township for which he acted. So far from his course in the matter being wrong, we think he showed unusual business sagacity and judgment, and that it is highly commendable. He seems to have performed his whole duty, and to have done it well. If other officers had acted with the same good judgment and

conscientious regard for the interest of their townships, we would hear less complaint that debts have been incurred but roads have not been built, and loss incurred, and the people received nothing in return. There is no force in this objection.

What we have said applies to the bonds issued to secure the location of the Industrial University. The liability was incurred, and the voters of Hensley participated in creating the liability, and have received the benefits it conferred—whether to the extent anticipated or not is not a proper subject of inquiry. But there is this difference in this debt and that incurred to aid in constructing the railroad, as in that case the vote was had before the order of separation was entered, whilst these bonds were voted after that order was entered. But it must be remembered that the order, by its terms, provided that the separation should not take place until the following April. This is the order, and it can not he held to have any other meaning.

If, then, the board of supervisors had power to provide that the order should become operative at a future day, the severance did not occur in this case until the period arrived. The General Assembly could not have intended to confer power on the board to cut off territory for a new township, and leave them for six or seven months without any township government; and it would seem that an order dividing the township could only be made at a regular meeting of the board, as sixty days' notice of the application is required to be given, nor does the statute refer to a called meeting, and hence we must conclude that such action must be had at a regular meeting of the board. If the order adopted at a regular session could only take effect on its adoption, the territory thus set off would be subject to great inconvenience, on account of want of power to repair roads and bridges, and other almost indispensable corporate actions. But an order entered as this was, can produce no inconvenience, as all corporate functions and duties are performed by the original town until the new one can elect

officers and become organized, and capable of performing corporate functions.

We are, for these and other reasons, clearly of opinion that this order was authorized and in strict accordance with the statute, and that the separation was not affected or complete until the first of April—the time fixed by the order—and that this debt became such a liability that it should be apportioned between the townships.

It is, however, urged, that the law under which this debt was voted was unconstitutional and immoral in its tendency. As to its propriety, we have no power to consider it—that is for the consideration of the General Assembly. We can only consider the question of the power of the legislative branch of the government to adopt any and all laws. If that department has the constitutional power to make the enactment, we have nothing to do with its policy. Then, could the General Assembly empower counties, towns and other municipal bodies to vote donations to secure the location and the erection of this university? Was it a corporate purpose, within the meaning of the constitution? In the case of *Burr* v. *The City of Carbondale*, 76 Ill. 455, these questions, under a similar law, were fully discussed, and the law was held to be constitutional, and the debt created for a corporate purpose, and the bonds so voted and issued were valid. That case, being similar in its material features, must be held to govern this case.

The entire record considered, we fail to perceive any error for which the judgment of the court below should be reversed, and it must be affirmed.

*Judgment affirmed.*