# SUPREME COURT OF TENNESSEE

### FOR ·THE

## MIDDLE DIVISION.

---

## NASHVILLE, DECEMBER TERM, 1909.

---

### (*Continued from Volume 122 Tenn.*)

---

JAMES A. RANSOM *et al. v.* RUTHERFORD COUNTY *et al.*

### (*Nashville.* December Term, 1909.)

1. CONSTITUTIONAL LAW. Statute creating a general educa-
   tion fund for general educational purposes, and including the es-
   tablishment and maintenance of State normal schools contains
   but one subject of legislation.
   The statute (Acts 1909, ch. 264), providing for the creation of a
   general education fund to be used, among other general educa-
   tional purposes, for the establishment and maintenance of State
   normal schools, does not violate the constitutional inhibition
   (art. 2, sec. 17) against more than one subject of legislation
   in a legislative bill; for the establishment and maintenance of
   State normal schools for the education and training of teachers
   is a part of the school system of the State, and is germane to
   the subject of the establishment of a general education fund.
   (*Post, pp.* 6-12, 18, 19, 21, 22.)

   Acts cited and construed: Acts 1909, ch. 264.

   Constitution cited and construed: Art. 2, sec. 17.

123 Tenn.]                     (1)

2. **SAME. "Or" read for "and;" statute authorizing cities and counties to issue bonds to aid State normal schools contains but one subject of legislation.**

A statute (Acts 1909, ch. 580), whose title or caption empowers municipalities "or" counties to issue bonds in aid of State normal schools located and established therein, and whose body empowers municipalities "and" counties to issue such bonds, does not violate the one subject provision of the constitution (art. 2, sec. 17), prohibiting the inclusion of more than one subject of legislation in a bill or act, and requiring that subject to be expressed in the title, because the disjunctive conjunction or particle "or" used in the caption was clearly and evidently intended for the copulative conjunction "and" as used in the body; and for the further reason that it was contemplated that such State normal schools would be located in the cities of the State, and thereby become both a municipal and a county purpose, and the legislative purpose evidently was to authorize both the county and municipality in which a State normal school might be established to issue bonds for the joint purpose of purchasing sites and erecting and equipping buildings for such school, so that there was but one subject of legislation in encouraging and authorizing municipal and county aid in the establishment of such schools. (*Post, pp.* 12, 13, 18, 19, 22, 23.)

Acts cited and construed: Acts 1909, ch. 580.

Constitution cited and construed: Art. 2, sec. 17.

3. **STATUTES. "Or" and "and" may be read convertibly in construing a statute, when.**

It is a familiar rule of construction that the disjunctive conjunction "or" and the copulative conjunction "and" may be read convertibly, whenever necessary to carry out the legislative intent as plainly expressed in a statute. (*Post, p.* 23.)

Cases cited and approved: United States v. Fisk, 3 Wall., 447; Dumont v. United States, 98 U. S., 143.

Ransom v. Rutherford Co.

4. CONSTITUTIONAL LAW. Statutes establishing public schools and levying taxes for their maintenance are authorized by the constitution.

It has long been firmly established in the jurisprudence of Tennessee that the establishment of a system of public schools and the exercise of the taxing power for their maintenance is at the same time a State, county, and municipal purpose, and is fully authorized by the constitution of the State. (Post, pp. 24, 29, 30, 31.)

Constitution cited and construed: Art. 11, sec. 12.

Cases cited and approved: Governor v. McEwen, 5 Humph., 282; Waterhouse v. Board, 8 Heisk., 859; University v. Knoxville, 6 Bax., 175; Railroad v. Franklin Co., 5 Lea, 707; Ballentine v. Pulaski, 15 Lea, 635; Edmondson v. Board, 108 Tenn., 557; Hamilton Co. v. Clark, MS., at Knoxville, September term, 1909; Livingston v. Darlington, 101 U. S., 407; Marks v. University, 37 Ind., 155; Burr v. Carbondale, 76 Ill., 455; Hensley v. People, 84 Ill., 544; Merrick v. Amherst, 12 Allen (Mass.), 500.

Cited as inapplicable: State v. University, 57 Mo., 178; Wasson v. Commissioners, 49 Ohio St., 622.

5. SAME. Same. State, county, and city may combine for the establishment and maintenance of a State normal school in the city and county.

While it is true that the State normal school to be established under the provisions of the statute contained in Acts 1909, ch. 580, is a State institution, still it combines features providing for educational advantages which are peculiarly accessible to the scholastic population of the city and county in which it is established, thus combining with the State purpose also a municipal and county purpose, and there is no constitutional obstacle in the way of the State, county, and city combining for the establishment and maintenance of such an institution. (*Post, pp.* 24-31, and especially 25 and 26.)

See citations under the preceding headnote.

6. SAME. Same. Same. Statute authorizing counties and cities to issue bonds to aid in establishing State normal schools is not unconstitutional, because persons from other counties may attend.

The statute (Acts 1909, ch. 580), authorizing counties and municipalities to issue bonds in aid of the establishment of State normal schools does not violate the constitutional provision (in art. 2, sec. 29) restricting or limiting the taxing power of counties and incorporated towns to county and corporation purposes, because persons from other counties are permitted to attend the school so established in the city and county by the aid of their bonds. (*Post, pp.* 28-31.)

Acts cited and construed: Acts 1909, ch. 580.

Constitution cited and construed: Art. 2, sec. 29.

Cases cited and approved: Railroad v. County Court, 1 Sneed, 667; University v. Knoxville, 6 Bax., 175; Edmondson v. Board, 108 Tenn., 557 (citing cases).

7. SAME. Same. Same. Same. Statute authorizing counties and cities to issue bonds to aid the State in establishing State normal schools in them is not unconstitutional because they are not permanently established by statute.

The statute (Acts 1909, ch. 580), authorizing counties and cities to issue bonds to aid in establishing State normal public schools, does not violate the constitutional provision (art. 2, sec. 29) restricting or limiting the taxing power of counties and incorporated towns to county and corporation purposes, because neither said statute, nor the statute (Acts 1909, ch. 264) providing for the establishment and maintenance of such schools, makes any provision for the permanent location of such schools in the county and city so issuing their bonds. (*Post, pp.* 24, 31, 32.)

Acts cited and construed: Acts 1909, chs. 264 and 580.

Constitution cited and construed: Art. 2, sec. 29.

8. SAME. The State is not a person, company, association, or corporation in the sense of the constitutional inhibition against

Ransom v. Rutherford Co.

giving or lending credit by counties and cities without the required vote of qualified voters.

The State is a sovereign, and is in no sense a person, company, association, or corporation in the meaning of the constitutional inhibition (art. 2, sec. 29) against the giving or lending the credit of counties and municipalities in aid of any person, company, association, or corporation, unless authorized by the assent of three-fourth of the votes cast by the qualified voters at an election held to determine the question. The State is the government, while the counties and incorporated towns are the arms and instrumentalities of the government; and, education being, under all the decisions, a State, county, and municipal, or corporate purpose, all three may unite in promoting this common object. Therefore, the statute (Acts 1909, ch. 580), authorizing counties and municipalities to issue bonds in aid of State normal schools located and established therein and to be established and maintained under Acts 1909, ch. 264, is not unconstitutional, because it did not provide for an election as to the issuance of such bonds under said constitutional provision. (*Post, pp.* 32-36.)

Acts cited and construed:   Acts 1909, chs. 264 and 580.
Constitution cited and construed:     Art. 2, sec. 29.

Cases cited and approved:   Colburn v. Railroad, 94 Tenn., 53; Lancey v. King Co., 15 Wash., 11; Walker v. Cincinnati, 21 Ohio St., 14, 54.

## FROM RUTHERFORD.

Appeal from the Chancery Court of Rutherford County. WALTER S. BEARDEN, Chancellor.

THOS. B. LYTLE, E. D. HANCOCK, and J. T. JETTON, for complainants.

RIDLEY & RICHARDSON, JESSE W. SPARKS, and A. L. TODD, for defendants.

MR. JUSTICE MCALISTER delivered the opinion of the Court.

The bill was preferred by certain citizens and taxpayers of Rutherford county and the city of Murfreesboro against said city and county to impeach the validity of two acts, passed by the general assembly of 1909, providing for the establishment of normal schools and the issuance of bonds by said city and county for the purchase of sites and the erection of buildings for said schools.

The first act assailed is chapter 264, Acts of 1909, approved April 27, 1909, and entitled:

"An act to provide for the improvement of the system of public education of the State of Tennessee—that is to say, to establish a general education fund by appropriating thereto annually twenty-five per cent. of the gross revenue of the State; to provide for the apportionment of this fund and specifying what part shall be apportioned to the several counties of the State on the basis of scholastic population; what part shall be used to equalize more nearly the school facilities of the several counties, and the conditions on which this part

shall be apportioned; what sum shall be used to assist in paying salaries of county superintendents, and on what conditions; what part shall be used to encourage and assist in the establishment and maintenance of public county high schools, and on what conditions; and providing for the grading and inspecting of high schools; what part shall be used for the establishment and maintenance of school libraries and on what conditions; what part shall be used for the establishment and maintenance of three normal schools for white teachers, one in each grand division of the State, and one agricultural and industrial normal school for negroes, and providing for the location, establishment, and control of said schools; and what part shall be apportioned to the University of Tennessee and its various stations; and to repeal chapter 537 of the Acts of 1907."

Section 1 provides:

"That for the purpose of improving, unifying and extending the system of public education of the State of Tennessee, for the purpose of giving more adequate support to public schools of all grades, and for the purpose of extending the benefits of the school system more equally to all the sections, counties, and districts of the State, a general education fund shall be, and the same is hereby created, and for the year one thousand nine hundred and nine and annually thereafter twenty-five per cent. of the gross revenue of the State shall be paid into this general education fund, to be apportioned as hereinafter provided; and the comptroller of the treasury shall pass, and he is hereby directed to

pass, on the first day of January and the first day of
July of each and every year, to the credit of said gen-
eral education fund, the amount due thereto according
to the provisions of this act, and to distribute the same
as hereinafter provided."

Section 2 provides:

"That sixty-one per cent. of the general education
fund provided by this act shall be apportioned to the
several counties of the State according to scholastic
population, as the interest on the permanent school
fund is apportioned and for the same purposes."

Section 3 provides:

"That ten per cent. of the general education fund
provided by this act shall be, and the same is hereby,
set aside as a special fund to be used and expended for
the purpose of more nearly equalizing the common
schools in the several counties of the State, the same
to be apportioned among the several counties of the
State by the State board of education in accordance
with the provisions hereinafter set forth."

Section 7 of said act provides:

"That thirteen per cent. of the general education fund
provided by this act may be used for the establishment
and maintenance of normal schools solely for the edu-
cation and professional training of teachers for the
elementary school of the State, as herein provided.
One normal school for the education and professional
training of white teachers shall be established and main-
tained in each grand division of the State, and shall be

open and free alike to white males and females resident in the State of Tennessee; and one agricultural and industrial normal school for the industrial education of negroes and for preparing negro teachers for common schools shall be established and maintained, and shall be open and free alike to negro males and females resident in the State of Tennessee; but no person shall be admitted to either of these schools who is under sixteen years of age and who has not finished at least the elementary school course prescribed for the public schools of the State; nor shall any person be admitted to either of the normal schools for white teachers who does not first sign a pledge to teach in the public or private schools of the State of Tennessee, within the next six years after leaving the school, at least as long as he or she has attended said school.

"Each school established and maintained under the provisions of this section of this act, shall have connected with it one or more practice and observation schools, in which shall be taught at least all the subjects prescribed for the primary schools of the State; and the county boards of education of any county, or the district directors of any school district, or the board of education of any incorporated city or town having a special school system under the provisions of its charter may, and the same is hereby empowered to contract with the State board of education to provide for the teaching of children of public school age in such practice and observation schools, and to pay to the said nor-

mal school all or any portion of the public school fund belonging to such county, district, or incorporated city or town, as agreed upon by the school authorities of said county, school district, or incorporated city or town, and the State board of education, as in the case of consolidated schools under the provisions of the State school law. . . .

"The general management and control of all normal schools established and maintained under the provisions of this section of this act shall be vested in the State board of education; and the said State board of education shall have power to employ a bookkeeper, whose duty it shall be to keep the accounts of the normal school funds as directed by the board, and the salary shall be fixed by the board and paid out of the normal school fund herein provided before the apportionment to the several schools and on the warrant of the comptroller.

"All schools established under the provisions of this section of this act shall be located by the State board of education; and in making such locations, said board shall take into consideration accessibility, centralness of position, healthfulness of location, cheapness of living, opportunities for arranging for suitable practice and observation schools, and the value and usefulness of offers of donations of grounds, buildings, money, etc. "In addition to any accepted donations of land, money, or buildings, the income from the fund provided by this

act and this section of this act for the years one thousand nine hundred and nine and one thousand nine hundred and ten or any portion of the same may be used for building and equipment.

"One-seventh of all the funds derived in any year from the provisions of this act and this section of this act shall be apportioned to the agricultural and industrial normal school established for the education and training of negroes, and the remaining six-sevenths shall be apportioned equally among the schools established and maintained for the education and training of white teachers in the three grand divisions of the State; but all moneys received by any one of the normal schools established in and maintained under the provisions of this act from any other source than from the fund herein provided to be paid out of the gross revenue of the State shall, under the direction of the State board of education, be accounted for and paid into the treasury of the State, to be placed to the credit of said school. . . . .

"All disbursements of money under the provisions of this section of this act shall be made on the certificate of the president and secretary of the State board of education, by the comptroller of the treasury, in the manner prescribed by law for the disbursement of money to charitable institutions."

Sections 9 provides:

"That all schools receiving assistance under the pro-

visions of this act shall be recognized as essential parts of the system of public education of the State of Tennessee, and annually, or on before the first day of August, the proper authorities of each shall submit to the State superintendent of public instruction a report in regard to the work, development, and progress of the school during the year ending with the thirtieth day of June next preceding, and a clear and itemized statement of all receipts and expenditures for the same period."

The other act assailed is chapter 580, Acts of 1909, approved May 1, 1909, and may be termed an enabling act to carry out the provisions of chapter 264, providing for the establishment of State normal schools.

Chapter 580 of 1909 is entitled:

"A bill allowing municipalities or counties to issue and sell bonds for the purpose of purchasing sites and erecting and equipping buildings for State normal schools, and to provide for the payment of the interest on the said bonds and for a sinking fund with which to retire the same, and to provide a method of loaning said sinking fund, and to provide for the disposition of the funds arising from the said sale of said bonds."

Section 1 provides:

"That any municipality, through the board of mayor and aldermen, is hereby authorized to issue one hundred thousand dollars ($100,000) of five per cent. or

less interest bearing bonds, or such part thereof as said municipality may desire to issue for the purpose of purchasing sites, erecting and equipping buildings for State normal schools; and that any county in the State of Tennessee is hereby authorized, through its county court at quarterly session, to issue one hundred thousand dollars ($100,000) five per cent. or less interest bearing bonds, or such part thereof as said county may desire to issue for the purpose of purchasing sites, erecting and equipping buildings for State normal schools."

Section 3 provides:

". . . That said issue of said bonds shall be for no other purpose than herein expressed, and the proceeds from said sale of said bonds shall be turned over to the State comptroller and placed to the credit of the State normal school of the county or municipality issuing said bonds, to be used for the purpose of purchasing sites, erecting and equipping buildings for said State normal school of said county or municipality."

It further appears from the bill that the State board of education, in pursuance of the power granted to it by the act, located the normal school for Middle Tennessee in the city of Murfreesboro and county of Rutherford; the said city and county having pledged the proceeds of $180,000 of bonds, as well as a free site for the location of the school.

The proposition submitted to the State board of education by the county of Rutherford and the city of Murfreesboro was in the words and figures following, to-wit:

"On condition that you locate the normal school for Middle Tennessee in or near the town or city of Murfreesboro, in the county of Rutherford, the said county of Rutherford agrees to give the sum of one hundred thousand dollars ($100,000) in county bonds, to be issued under the provisions of chapter 580, Acts of 1909.

"On the same conditions, and under the same act of the legislature, and for the purposes set out in said act, the city or town of Murfreesboro, Tennessee, agrees to give eighty thousand dollars ($80,000) in bonds.

"Bonds issued and appropriations made under this agreement shall be turned over to the State comptroller and placed to the credit of the State normal schools of the county or municipality issuing said bonds, to be used for the purpose of purchasing sites, erecting and equipping buildings for said State normal school of said county or municipality within sixty days from the date of receiving official notice from the State board of education that this proposition is accepted.

"This the 31st day of August, 1909.

"[Signed] G. H. Wilkinson, County Court Clerk, for the County of Rutherford. J. H. Crichlow, Mayor, E. T. Rion, Recorder, for the City or Town of Murfreesboro, Tennessee."

The mayor and aldermen of Murfreesboro passed the following ordinance on this subject:

"That by and under the authority granted by an act of the general assembly of the State of Tennessee, known as chapter 580, Acts of 1909, authorizing mu-

Ransom v. Rutherford Co.

nicipalities to issue and sell bonds for the purchase of sites and equipping buildings for State normal schools, and to provide for the payment of interest on said bonds, and for a sinking fund, and to provide for the disposition of funds arising from said sale of said bonds, and in consideration of certain contracts entered into by and between the said city of Murfreesboro and the State board of education with reference to the teaching of city public schools, and the erection and equipment of a model or observation school in or near the city, there shall be issued by said city of Murfreesboro, Tennessee, eighty thousand dollars ($80,000) in coupon bonds for the purpose of purchasing a site, erecting and equipping buildings, for said State normal school for Middle Tennessee, for the education and professional training of white teachers, and shall be open and free alike to white males and females resident in the State of Tennessee, in accordance with chapter 264, Acts of 1909 of said published Acts."

The contract referred to in said ordinance is as follows:

"In pursuance of the authority vested in the Tennessee State board of education to arrange for suitable practice and observation schools in connection with the State normal school for Middle Tennessee, and in consideration of the donation by the corporation of Murfreesboro the sum of $80,000, for the location of the said State normal school for Middle Tennessee in or near the said town of Murfreesboro, the following contract

and agreement is hereby entered into by and between the said State board of education and the said corporation of Murfreesboro to provide for suitable practice and observation schools for said State normal for Middle Tennessee, and to provide for a better school system for said corporation of Murfreesboro, the said State board of education agrees to maintain said city school of said corporation of Murfreesboro as the practice and observation school for said State normal for Middle Tennessee, and to this end to employ expert or professionally trained teachers to teach all pupils entitled to attend said city school, including all grades as provided by law (from first grade to eight inclusive), and to furnish expert supervision and control of said city system, and to build, equip, and furnish any additional buildings necessary to provide for pupils who are entitled to attend said city schools under the law, the entire expense of maintenance to be paid by said State board of education.

"The corporation of Murfreesboro hereby agrees, in addition to the donation of said $80,000 above mentioned, to lease free of rent all the buildings, grounds, and equipments belonging to said city for the use of said State board of education, in which to run said city schools, and to turn over to said State board of education the entire income for said city schools, and to give entire management and control of said city school system to said State board of education, the said State board of education being empowered by this

contract to select all teachers and to do whatever is necessary in conducting said city system of schools.

"It is a part of this contract that said State board of education shall bear the expense of repair, insurance, and other expenses connected with all buildings and equipment.

"It is further agreed that all children of school age within the corporate limits of the corporation of Murfreesboro shall be entitled to attend, free of charge, said model and observation schools, and all other departments of said State normal school, under such rules and regulations as may be prescribed by said State board of education."

The following resolution shows the action of the quarterly county court of Rutherford county in this matter:

"Whereas, the quarterly county court of said Rutherford county is of opinion that it would be to the interest and advantage of said county and citizens to have said normal school for the Middle Division of the State of Tennessee located in said Rutherford county:

"Therefore, be it resolved by the said quarterly court of said county, and it is hereby ordered by said court, that one hundred thousand dollars ($100,000) of not more than five per cent. interest bearing coupon bonds of said Rutherford county, payable in twenty-five years from date of issue, the interest thereon to be paid semiannually; said bonds to be issued and sold in compliance with the terms and stipulations of said act authorizing

same, proceeds to be used as directed by said act passed
by the general assembly of the State of Tennessee, of
April 29, 1909, and approved on May 1, 1909, being chap-
ter 580 of Acts of 1909 as aforesaid: Provided, how-
ever, that said State normal school for said Middle
Division of Tennessee is located in said Rutherford
county by the State board of education, said bonds to
be in denominations to be determined by the committee
hereinafter appointed."

Complainants allege and charge that, in pursuance
of these several contracts entered into between the de-
fendants and the State board of education, the defend-
ants, city of Murfreesboro and county of Rutherford, are
in the act of issuing respectively $80,000 in bonds of the
city of Murfreesboro, and $100,000 in bonds of the coun-
ty of Rutherford, and to provide a levy of taxation for
the interest and sinking fund, as provided in said acts,
and to carry out the agreement entered into between
said parties, and complainants charge this will be done
if not inhibited by an order of the chancery court.

Complainants allege that both of said acts under
which the defendants are about to proceed are void, be-
cause in contravention of the constitution of the State.

The bill then sets out the provision of the constitu-
tion which are claimed to be violated by said legisla-
tion, and concludes with a prayer that the defendants,
city of Murfreesboro and county of Rutherford, be per-
petually enjoined against issuing the bonds described,

Ransom v. Rutherford Co.

and that said acts be declared unconstitutional and void
for the reasons alleged.

A demurrer was interposed on behalf of the defend-
ants, assigning five different grounds, which will be spe-
cifically stated later on in the disposition of the ques-
tions raised. .

The chancellor was of opinion that the demurrer
was not well taken, and overruled the same.

Thereupon the complainants prayed an appeal, which
was granted by the chancellor in the exercise of the
discretion conferred on him by the statute, and the
cause is now before this court on assignments of error
made on behalf of the complainants, which are as fol-
lows:

First.   Because chapters 264 and 580 of the Acts of
the general assembly of 1909 are unconstitutional and
void, in that said chapters violate article 2, sec. 17, of
the constitution of the State, which provides that "no
bill shall become a law which embraces more than one·
subject, that subject to be expressed in the title."

Second.   Because chapter 580 of the Acts of the gen-
eral assembly of 1909 is unconstitutional and void, in
that said chapter violates article 2, sec. 28, of the con-
stitution of the State, which provides that "all prop-
erty shall be taxed according to its value, that value
to be ascertained in such manner as the legislature
shall direct, so that taxes shall be equal and uniform
throughout the State."

Third.   Because chapter 580 of the Acts of the gen-

eral assembly of 1909 is unconstitutional and void, in that said chapter violates article 2, sec. 29, of the constitution of the State, which provides that "the general assembly shall have power to authorize the several counties and incorporated towns in this State, to impose taxes for county and corporation purposes respectively in such manner as shall be prescribed by law; and all property shall be taxed according to its value, upon the principles established in regard to State taxation. But the credit of no county, city or town shall be given or loaned to or in aid of any person, company, association, or corporation, except upon an election to be first held by the qualified voters of such county, city or town, and the assent of three-fourths of the votes cast at said election. Nor shall any county, city or town become a stockholder with others in any company, association or corporation except upon a like election, and the assent of a like majority."

. Fourth. Because chapter 580 of the Acts of the general assembly of 1909 is unconstitutional and void, in that said chapter violates article 11, sec. 8, of the constitution of the State, which provides that "the legislature shall have no power to suspend any general law for the benefit of any particular individual, nor to pass any law for the benefit of individuals inconsistent with the general laws of the land; nor to pass any law granting to any individual or individuals rights, privileges, immunities or exemptions other than such as may be, by the same law extended to any member of the com-

munity, who may be able to bring himself within the provisions of such law."

It is said in the first place that chapter 264, Acts of 1909, is void for the reason it violates the two-subject clause of the Constitution.

The contention is that the object of the bill is to provide for the creation of a general educational fund and also for the establishment of normal schools.

Chapter 264 is entitled:

"An act to provide for the improvement of the system of public education of the State of Tennessee— that is to say, to establish a general education fund by appropriating thereto annually twenty-five per cent. of the gross revenue of the State," etc.; the title providing how this fund shall be distributed and appropriated. Among other purposes:

"For the establishment and maintenance of three normal schools for white children, one in each grand division of the State, and one agricultural and industrial normal school for negroes," etc.

It is argued that the establishment and maintenance of State normal schools is not germane to an act to establish a general education fund, etc., and that these separate and distinct subjects being also embraced in the body of the act renders it unconstitutional and void.

We are unable to concur with counsel in this position. It seems quite clear that the establishment and maintenance of normal schools for the education and training of teachers is a part of the school system of the State.

The duty of establishing and maintaining common schools for the education of the masses, the diffusion of useful knowledge, the nurture of literature and science, are enjoined on the legislature by the organic law. It is impossible to have common schools or schools of higher grades without teachers, and it is of the first importance for the successful administration of the school system of the State that only competent teachers should be placed in these responsible positions.

It is plain, therefore, that a provision for the establishment of normal schools, wherein teachers may be educated and qualified for the performance of their professional duties, would be an essential and indispensable part of any plan for the improvement of the system of public education in the State.

Again, it is insisted that chapter 580, Acts of 1909, also violates the two-subject clause of the constitution in this, that the caption of the act recites "A bill allowing municipalities 'or' counties to issue," etc., while the body of the act provides "that any municipality 'and' that any county," etc., and it is therefore insisted that the disjunctive particle "or," used in the caption, cannot be read as the conjunction "and."

We think it quite plain from a consideration of the act that it was the intention of the legislature to delegate to counties and municipalities the authority to issue coupon bonds for the purpose of purchasing sites and erecting and equipping buildings for State normal schools.

Ransom v. Rutherford Co.

It was contemplated that such an institution would be located in the cities or towns of the State, and thereby become both a municipal and a county purpose. The object of the legislature evidently was to authorize the county and municipality in which such an institution might be established to jointly issue bonds for the purchase of sites and the erection of buildings, etc.

It is a familiar canon of construction that the disjunctive particle "or" and the conjunction "and" may be read convertibly, whenever it is necessary to carry out the intention of the legislature, as plainly expressed in the statute. 29 Cyc., 1505; *United States* v. *Fisk,* 3 Wall., 447, 18 L. Ed., 243; *Dumont* v. *United States,* 98 U. S., 143, 25 L. Ed., 65.

The next question presented is whether chapter 580, Acts of 1909, is unconstitutional for the reason, as is claimed, that it violates article 2, sec. 29, of the constitution, which provides that:

"The general assembly shall have power to authorize the several counties and incorporated towns in the State to impose taxes for county and corporation purposes respectively, in such manner as shall be prescribed by law; and all property shall be taxed according to its value upon the principles established in regard to State taxation. But the credit of no county, city or town shall be given or loaned to, or in aid of any person, company, association, or corporation, except upon an election to be first held by the qualified voters of such county, city or town and the assent of three-fourths

of the votes cast at said election. Nor shall any county, city or town become a stockholder with others in any company, association, or corporation, except upon a like election, and the assent of a like majority."

The first contention made on behalf of complainants under this clause of the constitution is that the appropriation of money and issuance of bonds by the county of Rutherford and by the city of Murfreesboro to secure the location of the Middle Tennessee normal school and for the purchase of sites and the erection of buildings, etc., do not constitute a county or corporation purpose within the meaning of this clause of the constitution.

It is said, in the first place, that the normal school to be so located will thereby become under the provisions of the act a State institution, and will pass under the control and management of the State board of education.

It is further urged that the act does not provide for the permanent location of said normal school in any particular county as a consideration for the appropriation of the money or issuance of the bonds, but that it is within the power and discretion of the State at any time hereafter to change the location of said school to any other county in the State.

It is further said that no special benefits, immunities, or privileges are given the citizens of Murfreesboro and Rutherford county, by reason of the location of said normal school at Murfreesboro, which may not be shared

by all other citizens of the State. In a word, it is said that every citizen of the State who desires to attend said school and partake of its educational advantages is equally privileged to do so, and yet the taxpayers of Murfreesboro and Rutherford county are not only onerated with the taxes provided for in the general educational bill, but with the bond issue of $180,000.

As we understand the argument of counsel, these are the main reasons assigned why the establishment of the State normal school in Rutherford county is not a county or corporate purpose.

It has long been firmly established in the jurisprudence of this State that the establishment of a system of public schools and the exercise of the taxing power for their maintenance is at the same time a State, county, and municipal purpose, and is fully authorized by the constitution of the State. Article 11, sec. 10, const. 1834; article 11, sec. 12, const. 1870; *Governor et al.* v. *McEwen,* 24 Tenn., 282; *East Tennessee University* v. *Knoxville,* 6 Baxt., 175; *Waterhouse et al.* v. *Board,* 8 Heisk., 859; *Edmondson* v. *Board of Education,* 108 Tenn., 557, 69 S. W., 274, 58 L. R. A., 170; *N., C. & St. L. R. R. Co.* v. *Franklin Co.,* 5 Lea, 707; *Hamilton Co.* v. *Clark,* MS. opinion, Knoxville, December term, 1909; *Ballentine* v. *Mayor, etc., Pulaski,* 15 Lea, 635.

While it is true the State normal school to be established under the provisions of this act is a State institution, it combines features providing for educational advantages which are peculiarly accessible to the scho-

lastic population of Rutherford county and the city of Murfreesboro, thus combining with the State purpose also a municipal and county purpose.

We can perceive no constitutional obstacle in the way of the State, county, and city combining for the establishment and maintenance of such an institution.

In *Marks* v. *Trustees of Purdue University*, 37 Ind., 155, "it appeared that certain land had been granted by the congress for the purpose of maintaining a college in which agricultural and mechanical arts should be especially taught. The legislature of the State of Indiana passed an act accepting and claiming the benefits of the provisions of this act of congress. On January 4, 1869, the board of commissioners of Tippecanoe county made an offer to secure the location of the Agricultural College within the county, and offered the sum of $50,000 in consideration that the college should be located there. On May 6, 1869, the legislature passed an act approving this donation, and locating the college in that county, and naming it the Purdue University. It was stated by the court that the sole object and purpose of the donation was to secure the location of the college in Tippecanoe county. It may be conceded that the college or university is a State university; and the question arises whether taxes may be assessed in a county to liquidate a debt contracted by the county in securing the location of such State institution in the county, for, if not, the debt cannot be valid.

"While the university is a State institution, and ev-

Ransom v. Rutherford Co..

ery citizen will have an equal right under the same circumstances to avail themselves of its privileges, still the location of it is in a given county will confer upon that county many local benefits. The parents of the county may send their sons and perhaps their daughters to the college to be educated at a less expenditure of time and money than would be incurred if it were situated at a more remote point in the State. The college, with its professors, tutors, attendants, and students, will probably diffuse much more money throughout the community than it otherwise would circulate, and also add to the intelligent and educated population of the place, and be the means of stimulating industry and increasing the wealth and moral worth of the community, and would enhance the attractions of society and the value of property. Now it seems to us that taxes collected to discharge an obligation entered into by the county solely for the purpose of securing the location of the college in that county cannot be said in any just sense to be collected for any State purpose; on the contrary, they are solely for a county purpose. . . . The fact that the college is a State institution cannot change the character and nature of the transaction. Railroads are in some sense State institutions, yet local subscriptions by cities are upheld. Highways and streets are State institutions, to the proper use and enjoyment of which all citizens have an equal right, yet local taxation to improve and keep them in order is constantly maintained. The taxation required being

merely for a county purpose, the provisions of const., sec. 1, art. 10, are complied with if the taxes are uniform throughout the county."

In *Burr* v. *City of Carbondale,* 76 Ill., 455, it appeared the bill was filed to enjoin the collection of taxes assessed to pay interest on certain bonds issued by the city of Carbondale in aid of the Southern Normal University. The court said in part as follows:

"A normal university enters into our plan of education, wherein teachers of our youth shall be taught how best and most effectually to discharge their duty. . . . This university is under the fostering care of the State, and under the provisions of the law it may be expended to vast proportions. It may be the germ of an institution which in time may rival the most famous institutions of learning of other countries and States. We are constrained to believe the purpose for which these bonds were issued was a corporate purpose, and the tax levied to pay the interest on them valid, and its collection should be enforced." *Merrick et al.* v. *Inhabitants of Amherst,* 12 Allen (Mass.), 500; *Hensley* v. *People,* 84 Ill., 544; *County of Livingston* v. *Darlington,* 101 U. S., 407, 25 L. Ed., 1015.

The cases of *State* v. *Curators of State University,* 57 Mo., 178, and *Wasson* v. *Commissioners,* 49 Ohio St., 622, 32 N. E., 472, 17 L. R. A., 796, we have examined, and do not think them in point.

It is not a constitutional objection to said act that persons from other counties of the State who wish to

qualify themselves for the profession of a teacher are permitted to attend this normal school and enjoy the educational facilities which it may afford. This question arose in *East Tennessee University* v. *Knoxville*, supra. The controlling question in that case was whether the city of Knoxville had the constitutional power to appropriate money for the benefit of the East Tennessee University, an institution of learning located just beyond the corporate limits of the city.

The court said in part as follows:

"The establishment and regulation of schools of every grade constitute legitimate corporation purposes. It is an axiom that knowledge, learning, and virtue are essential to the preservation of republican institutions.

"The establishment and regulation of schools are therefore corporation purposes of the local government of a town or city of the highest order.   .   .   .

"The controlling question is, Was the appropriation made to secure to the inhabitants of the city the benefits and advantages of education?  Nor is the principle affected by the fact that pupils from every other county or State or country have the same privilege of going to the school with the pupils whose parents are members of the corporation of Knoxville.  The appropriation is made, not to secure the inhabitants of Knoxville either superior rights or privileges over the inhabitants of other portions of the country, but to secure the advantages resulting from their proximity to the school.  The object is to secure the permanent location of the school

at the point so near to Knoxville that the facilities for and the benefits of a thorough education can be enjoyed by the children of its inhabitants without the expense and inconvenience to which those are subjected to who are situated at a distance from the school. It does not secure superior rights in the school, but superior advantages in enjoying common rights."

In *L. & N. R. R. Co.* v. *County Court,* 1 Sneed, 667, 62 Am. Dec., 424, it was said:

"The common argument that the power of a county or town corporation is confined to their limits has been everywhere met and refuted or exploded. And the kindred argument that to constitute a town or county purpose the improvement or object for which the people are taxed must be entirely within their borders has suffered the same fate."

In *Edmondson* v. *Board of Education,* supra, it was said:

"Even if the city of Memphis alone furnished the funds for the maintenance of its public schools, it would not necessarily follow that there was a violation of the implied inhibition of this clause of the constitution in granting without pay the privileges of these schools to children living just outside its limits, but located conveniently thereto.

"In the words of the constitution, 'Knowledge, learning and virtue being essential to the preservation of republican institutions,' it might be very well be held that it was as conducive to good order and public mor-

Ransom .v. Rutherford Co.

als of the community of Memphis that the opportunities
and advantages of education afforded by these municipal
schools should be availed of by children just beyond as
well as those within the municipal border, for it has
been held that there may be a corporate purpose within
the provisions of this clause, though accomplished out-
side of the local limits.

"Thus the bringing of a railroad near a city, when
calculated to promote the interest of the city, was
held such a purpose. *McCallie* v. *Chattanooga,* 3 Head,
318; *Adams* v. *R. R. Co.,* 2 Cold., 645. And in *Shelby
County* v. *Exposition Co.,* 96 Tenn., 653 [36 S. W., 694,
33 L. R. A., 717,] that an appropriation to defray the
expense of an exhibition of the resources of the county
was a county purpose."

Moreover, we think that under the provisions of this
statute and the contracts entered into between the
county and the city on the one hand and the State board
of education on the other show that the people of that
community are more especially benefited by the location
and the maintenance of the school in their midst than
any other citizen of the State.

Again, it is said there is nothing in either of the acts
providing for the permanent location of the normal
school, and hence that, after issuing the bonds and in-
curring the expense in establishing the normal school
in Rutherford county and in the city of Murfreesboro,
it may hereafter be relocated by the State in the discre-
tion of the legislature.

It has already been observed that the contracts entered into between the city and county and the State board of education especially provide for the permanent location of the institution in the city of Murfreesboro, and it is to be presumed that such a contract will be regarded as inviolable by both parties; but the failure of the act itself to provide for the permanent location of the normal school does not go to the constitutionality of the act.

The remaining question is whether this bond issue should have been authorized by a three-fourths vote of the electors at an election held for such purpose.

As already seen, article 2, sec. 29 of the constitution, provides:

"The credit of no county, city or town shall be given or loaned to or in aid of any person, company, association, or corporation except upon an election to be first held by the qualified voters of such county, city or town, and the assent of three-fourths of the votes cast at such election. Nor shall any county, city or town become a stockholder with others in any company, association or corporation, except upon a like election and the assent of a like majority."

It is conceded that no election was held for this purpose, nor did chapter 580, Acts of 1909, authorizing the creation of this debt and the issuance of the bonds by the city and county, provide for such an election.

This provision is not found in the constitution of 1835, but finds its genesis in the constitution of 1870.

In *Colburn* v. *Railroad*, 94 Tenn., 53, 28 S. W., 301, this court, construing this provision of the constitution, said:

"It is evident that the letter and spirit of this provision is that the county shall not be a stockholder or joint owner with any company, association, or corporation in any enterprise or improvement, although it may be one in which the county may be otherwise authorized to enter."

The question, then, arising for our determination, is whether the State is a company, association, or corporation to which the credit of the county or municipality shall not be given, or with which it shall not be a stockholder, within the meaning of this clause of the constitution.

When we consider that the evil sought to be remedied by this amendment to the constitution was the improvident subscriptions frequently made by counties and municipal corporations to railroad enterprises and works of internal improvement, whereby large and onerous debts were incurred and no corresponding benefit received, we can perceive no ground for the contention that the State is included among those to whom such credit shall not be given, etc.

This question has arisen in other jurisdictions under constitutional provisions similar to our own, and it has been uniformly adjudged that the State was not included in the classifications made.

123 Tenn—3

In *Lancey* v. *King Co.*, 15 Wash., 11, 45 Pac., 645, 34 L. R. A., 817, among other objections to the constitutionality of an act of the legislature, it was urged that it was in conflict with section 7, art. 8, of the constitution of that State, which provides that:

"No county . . . shall hereafter give any money or properties or loan its money or credit in aid of any individual, association, company, or corporation."

"It is clear," said the court, "that neither the State nor the United States is an 'individual, association, company or corporation,' within the meaning of this section, and cannot legitimately be brought therein by any judicial construction." *Walker* v. *Cincinnati*, 21 Ohio St., 14, 8 Am. Rep., 24.

In *Walker* v. *Cincinnati*, 21 Ohio St., 54, 8 Am. Rep., 24, the supreme court of that State had before it the validity and constitutionality of an act of the general assembly of that State authorizing the city of Cincinnati to build the Cincinnati Southern Railroad. It was urged that such legislation was in violation of the sixth section of article 8 of the constitution of that State, which provided:

"The general assembly shall never authorize any county, city, or town, or township by vote of its citizens or otherwise to become a stockholder in any joint stock company, corporation, or association whatever; or raise money for or loan its credit to or in aid of any such company, corporation, or association."

Ransom v. Rutherford Co.

"The mischief which this section interdicts is a business partnership between a municipality or subdivision of the State and individuals or private corporations or associations. It forbids the union of public or private capital or credit in any enterprise whatever. In no project originated by individuals, whether associated or otherwise with a view to gain, are the municipal bodies named to participate in such manner as to incur pecuniary expense or liability. They may neither become stockholders nor furnish money or credit for the benefit of the parties interested therein. Though joint-stock companies, corporations, and associations only are named, we do not doubt that the reason of the prohibition would render it applicable to the case of a single individual. The evil would be the same, whether the public suffered from the cupidity of a single person or from that of several persons associated together."

Such being the purpose of the constitutional provision, the State, not being expressly included in its terms, cannot be included by any reasonable implication.

The State is a sovereign, and is in no sense a person, company, association, or corporation in the sense of this constitutional inhibition. The State is the government, while the counties and incorporated towns are arms and instrumentalities of the government; and, education being, under all the decisions, a State, county, and municipal purpose, all three may unite in promoting this common object.

Ransom v. Rutherford Co.

Such being the purpose and scope of the legislation embraced in the acts under consideration, we find no valid constitutional objection to their enforcement.

Such was the opinion of the able chancellor who heard this cause in the court below, and his decree is in all respects affirmed.