[Sac. No. 2432.   In Bank.—December 14, 1915.]

CITY OF SACRAMENTO (a Municipal Corporation) et al.,
Petitioners, v. E. D. ADAMS, as City Auditor of the
City of Sacramento, etc., Respondent.   .

[Sac. No. 2414.   In Bank.—December 14, 1915.]

GEORGE W. PELTIER, Petitioner, v. E. D. ADAMS, as
City Auditor of the City of Sacramento, etc., Respondent.

MUNICIPAL CORPORATIONS—CITY OF SACRAMENTO—CONSTITUTIONAL LAW
—DONATION OF LAND TO STATE—MUNICIPAL INDEBTEDNESS.—There
is nothing in the state constitution which prohibits the city of
Sacramento from expending municipal funds or incurring a bonded
indebtedness, for the purpose of purchasing land in the city to be
donated to the state, on condition that the state erect and equip
public buildings thereon for the use of the state, devoting such por-
tion of the land as is not actually used for buildings to the pur-
poses of a public park, notwithstanding the land proposed to be so
purchased and donated is to be under the absolute control of the
state in so far as its needs and desires as to the actual occupation
of the same by state buildings are concerned, and the state will be
at liberty to use all of the land for buildings, excluding all use of
the same for park purposes.

ID.—POWER OF MUNICIPALITY TO EXPEND FUNDS FOR PUBLIC PURPOSES
NOT STRICTLY MUNICIPAL.—Although the expenditure of municipal
funds or property and the right to tax the property owners of a
municipality for other than strictly municipal purposes, even though
the proposed expenditure is for some other public purpose, is not
authorized unless the power is clearly and unmistakably conferred
on the municipality, still the *state* may confer such a power on a
municipality as regards any purpose that may fairly be held to
be a public one or of benefit to the municipality.

ID.—LENDING CREDIT OF MUNICIPALITY—GIFTS OF PROPERTY—LIMITA-
TIONS NOT APPLICABLE WHEN STATE IS BENEFICIARY.—Section 31 of
article IV .of the constitution, prohibiting the legislature from
authorizing the giving or lending of the credit of any county, city
or county, city, township, or other political corporation or subdivi-
sion of the state, "in aid of or to any person, association, or cor-
poration, whether municipal or otherwise, or to pledge the credit
thereof, in any manner whatever, for the payment of the liabilities
of any individual, association, municipal or other corporation what-
ever," and also providing that the legislature shall not have power
"to make any gift, or authorize the making of any gift, of any pub-

lic money or thing of value to any individual, municipal or other corporation whatever," is inapplicable to the giving or lending of the credit of one of the agencies of the state or the making of any gift by one of such agencies, *to the state itself*.

ID.—FREEHOLDERS' CHARTER—APPLICABILITY OF GENERAL LAWS.—A city having a freeholders' charter is subject to general laws, even in municipal affairs, when the subject matter is not covered by the charter.

ID.—ACT OF JUNE 5, 1913, AUTHORIZING DONATIONS TO STATE—ACT APPLICABLE TO CITY OF SACRAMENTO.—The act of June 5, 1913 (Stats. 1913, p. 388), authorizing any city and county, or county, or city, operating under freeholders' charter or otherwise, or any town, or any municipal corporation, in the state, to donate and grant to the state any real property owned by it or which it may acquire within its corporate limits for a site upon which the state may erect public buildings, and to use its funds for the acquisition of such a site, and to incur indebtedness for that purpose, is, in the absence of any provision to the contrary in its freeholders' charter, applicable to the city of Sacramento.

ID.—PROCEEDINGS FOR INCURRING BONDED INDEBTEDNESS—RETROACTIVE EFFECT OF ACT.—That act, being expressly intended to be retroactive, operated to validate the proceedings instituted by the city of Sacramento prior to its adoption for the purpose of incurring the indebtedness to acquire the land so to be donated to the state.

ID.—LEGISLATURE MAY VALIDATE PAST TRANSACTIONS.—In the absence of constitutional restrictions, the power of the legislature to validate past transactions which it could have authorized in advance is restrained only by the necessity of protecting vested rights.

APPLICATIONS for writs of mandate directed to the Auditor of the City of Sacramento.

The facts are stated in the opinion of the court.

Devlin & Devlin, and Downey, Pullen & Downey, for Petitioners.

Archibald Yell, for Respondent.

ANGELLOTTI, C. J.—These are original applications to this court for peremptory writs of *mandamus* against the city auditor of the city of Sacramento to compel the performance by him of the same acts, viz., to attest and sign certain bonds of the city, the issuance of which has been authorized and directed by the appropriate boards and officers of the city, and

by vote of the electors of said city at an election regularly called and held for that purpose. The Peltier case was inaugurated by a taxpayer of the city, and the other case by the city itself and the city commission solely to avoid all question as to the right of a taxpayer to maintain such a proceeding. It therefore will not be necessary to discuss or consider that question.

No question is raised as to the regularity of the proceedings thus far had in the matter of the bonds. The sole question presented is as to the power of the city of Sacramento, which is the capital of the state, to expend money or to contract an indebtedness for money to be expended, for the purpose for which this money is proposed to be used. This purpose, as stated in the various resolutions and ordinances, is the acquirement of two blocks of land in said city adjoining the present state capitol grounds and park, at a cost of seven hundred thousand dollars, "for the purposes of a public park," the same to be absolutely conveyed to the state of California, on the condition that the state shall construct, furnish, and equip public state buildings thereon at a cost of not less than three million dollars, and shall always maintain, subject to such police control and other control as the state may deem necessary, the land not covered by public buildings as a park for the use of the public. None of said bonds was to be issued or sold until the state shall provide for the construction, furnishing, and equipping of said buildings at the aggregate cost of three million dollars. It appears that by act of June 5, 1913, the legislature of the state provided for the incurring of an indebtedness in the sum of three million dollars for the purpose of constructing and equipping state buildings in said city, none of the same, however, to be expended "until a site suitable for such purpose, and acceptable" to a state board created by the act "shall be donated or given to the state, the title thereto to be free and clear of all liens and encumbrances, the number of buildings and their location on the lands to be donated" to be determined by said board. This act was duly approved by the electors of the state, at an election at which it was submitted for ratification, and constitutes the action by the state on which it is proposed by the city to issue the bonds for the purpose of acquiring the land and conveying the same to the state.

Substantially, then, the question is whether the city of Sacramento may expend municipal funds or incur a bonded indebtedness, for the purpose of purchasing real property in the city to be donated to the state, on condition that the state erect and equip thereon public buildings for the use of the state, at an expense of at least three million dollars, devoting such portion of the real property as is not actually used for buildings to the purposes of a public park for the enjoyment of the people.   It is true that the land proposed to be purchased and donated to the state is to be under the absolute control of the state in so far as its needs and desires as to the actual occupation of the same by state buildings are concerned, and that the state will be at liberty to use all of the same for buildings, excluding all use of the same for park purposes.   So that substantially the question is whether the city of Sacramento may acquire land to be absolutely donated to the state for state buildings.

We are satisfied that there is nothing in our state constitution which prohibits such action by a municipality.   It is true that the expenditure of municipal funds or property and the right to tax the property owners of a municipality for other than strictly municipal purposes, even though the proposed expenditure is for some other public purpose, is not to be taken as authorized unless the power is clearly and unmistakably conferred on the municipality, but that the *state* may confer such a power on a municipality as regards any purpose that may fairly be held to be a public one, of benefit to the municipality, there can be no doubt.   Under our constitution the power may be conferred on a city by express provision in a freeholders' charter, approved by the legislature, or by the legislature directly where the city is operating under general laws only, or where there is nothing in the freeholders' charter expressly or impliedly prohibiting the same—that is, always, of course, if there be nothing in the constitution of the state that prohibits the conferring on or exercising by the municipality of such a power.   The only provision of our constitution brought to our attention in this matter is section 31 of article IV, which prohibits the legislature from authorizing the giving or lending of the credit of any county, city and county, city, township, or other political corporation or subdivision of the state ''in aid of or to any person, association, or corporation, whether municipal or

otherwise, or to pledge the credit thereof, in any manner whatever, for the payment of the liabilities of any individual, association, municipal or other corporation whatever''; and also providing that the legislature shall not have power ''to make any gift, or authorize the making of any gift, of any public money or thing of value to any individual, municipal or other corporation whatever.'' We are satisfied that this cannot be construed as applicable to the giving or lending of the credit of one of the agencies of the state or the making of any gift by one of such agencies, *to the state itself.* The state is not a corporation within the meaning of this section. This was squarely held of a substantially similar provision of the constitution of the state of Washington in *Lancey* v. *King County,* 15 Wash. 9, [34 L. R. A. 817, 45 Pac. 645]. (See, also, *Walker* v. *Cincinnati,* 21 Ohio St. 14, [8 Am. Rep. 24].) It is to be borne in mind that the state itself has absolute control of all the property of such of its agencies as cities, towns, counties—is, in a sense, the ultimate owner thereof.

It may well be argued, in view of language used in the freeholders' charter of the city of Sacramento, that the city was empowered thereby to create the indebtedness for the purpose specified. The following language in section 1 of said charter, viz.: ''The city . . . shall have, possess and exercise all powers and rights vested in said city of Sacramento under this charter and the laws of this state, *together* with such additional powers as are now, or may hereafter be exercised by or vested in any municipal corporation under the constitution or laws of this state, *or are or may be considered as necessary to or promotive of the welfare, progress or advantage of said city of Sacramento or its inhabitants. It is the intention by and through this charter to confer upon and vest in said city of Sacramento plenary power touching all matters pertaining to the government, progress, advantage and interests of said city of Sacramento and the health, safety, convenience, advantage, protection, welfare and happiness of its inhabitants, which power shall only be limited by the constitution of this nation or state or by this charter,''*—is certainly very broad and comprehensive. It requires no argument to sustain the proposition that the construction and equipment by the state upon the land proposed to be donated of buildings suitable and proper for state capitol purposes to be used solely for these purposes, at an expense of three

million dollars, with the maintenance of the grounds suitable in connection with such use, might well be considered a matter pertaining to the progress, advantage, and interests of the city, and the convenience and advantage of its inhabitants. However, it is not necessary to here decide this question. It may be that the words there used must be taken, in a limited sense, as applying only to such matters as are the proper subject of strictly *municipal regulation* (see *Low v. Mayor etc. of Marysville,* 5 Cal. 214), but we do not wish to be understood as intimating it to be our opinion that such is the case.

The section does in terms vest in the city "such additional powers as are now, or may hereafter be exercised by or vested in, any municipal corporation under the constitution or laws of this state." If it be conceded that there is nothing in the charter authorizing such action as is here proposed on the part of the city, our attention has been directed to no provision or provisions thereof so affecting the matter as to exclude the legislature from enacting a general law conferring the necessary power. It appears to be settled that a city having a freeholders' charter is subject to general laws, even in municipal affairs, when the subject matter is not covered by the charter. (See *Clouse* v. *San Diego,* 159 Cal. 434, [114 Pac. 573]; *Fragley* v. *Phelan,* 126 Cal. 395, [58 Pac. 923].) Besides, as we have seen, the charter here expressly provides that the city shall have such additional power as might thereafter be vested in any municipal corporation. By an act of the legislature approved June 5, 1913, in effect August 10, 1913 (Stats. 1913, p. 388), any city and county, or county, or city, operating under freeholders' charter or otherwise, or any town, or any municipal corporation, in the state of California, was expressly authorized to donate and grant to the state of California any real property owned by it or which it may hereafter acquire within its corporate limits for a site upon which the state of California may erect public buildings, and to use such part of its funds as deemed necessary toward the acquisition of a site within its corporate limits upon which the state may erect public buildings, and also to incur indebtedness for any such purpose. It cannot be doubted that this act, applicable to every municipality in the state, fully authorized the city of Sacramento to take such action as is here involved. The objection urged

to its application here is, that it was not adopted until a few months after the institution of the proceedings for the incurring of the indebtedness and the election at which the question was submitted to the electors of the city. But the act was intended to be retroactive, and expressly provided that where an election had been held in accord with the laws of the state, and the necessary two-thirds of all the qualified electors voting thereat shall have voted in favor of incurring an indebtedness for any of said purposes, all the proceedings leading up to the issuance and the proposed issuance of bonds for any such purpose are legalized, ratified, and declared valid to all intents and purposes, and the power to issue the bonds confirmed, with a proviso not material to the case before us. In view of what we have said it is plain that the legislature could authorize in advance the very things it has authorized by this act. It was said in *City of Redlands* v. *Brook,* 151 Cal. 474, 478, [91 Pac. 150], that "in the absence of constitutional restrictions the power of the legislature to validate past transactions which it could have authorized in advance is restrained only by the necessity of protecting vested rights," and, of course, this is a well-settled proposition. This was said in a proceeding to compel the signing of certain municipal bonds by a city treasurer, and in holding that the provisions of a curative statute were a complete answer to the claim that the city was without power to issue bonds for the purpose designated. It was said that there were no vested rights to be guarded, and that the proceedings of the plaintiffs in ordering the issue of the bonds, if not originally valid, certainly became valid immediately upon the passage of the curative act. This case is directly in point here. A case very similar to the case at bar, both upon the authority of the legislature to authorize a municipality to incur an indebtedness for some public purpose other than one strictly municipal, and its power to validate by curative statute bonds already issued or as to which proceedings for the issuance were pending, is that of *Schneck* v. *Jeffersonville,* 152 Ind. 204, [52 N. E. 212]. The bonds there issued by a municipality to raise money for the purchase of a lot of land and the construction thereon of a courthouse and jail for Clark County had been held invalid in *Myers* v. *Jeffersonville,* 145 Ind. 431, [44 N. E. 452], for the want of power in the municipality to incur such an indebtedness. It was substantially

said that the object of the legislature in the subsequent enactment of its validating statute was to fully validate the bonds in all respects, and to make them binding obligations, so far as the legislature could, whether this invalidity consisted in the absence of authority to issue the bonds, or on account of any irregularity or informality by which they might be affected. It was held that in its effect or operation the act must be held equivalent to conferring original legislative authority upon the city of Jeffersonville, which would have authorized it to incur the indebtedness and issue the bonds, thus making the proceedings valid *ab initio*. It was further held that, in the absence of constitutional restrictions, either federal or state, where vested rights have not intervened, such legislation is a valid exercise of the legislative power of the state. The question was exhaustively discussed and many authorities cited, with the result that the bonds were held to have been validated by the curative act. We entertain no doubt on the proposition that, even if the city of Sacramento was without power to incur the proposed indebtedness for the purpose stated prior to the enactment of the act of June 5, 1913, the proceedings looking to the same certainly became valid immediately upon the passage of that act.

There has not been cited, and we have not found, any case which denies the power of the *state* to authorize one of its municipalities to appropriate money or property to the state for a public purpose which may fairly be held beneficial to the municipality and the people thereof, notwithstanding that such purpose is not strictly a municipal one. Of course, such a power may not be conferred by the *legislature* of a state where there is a constitutional prohibition of the granting or exercise of any such power, but here, as we have seen, there is no such constitutional prohibition.

No other objection than that we have discussed is made as to the proposed bonds.

Let a peremptory writ of *mandamus* issue as prayed.

Melvin, J., Shaw, J., Lorigan, J., Sloss, J., Henshaw, J., and Lawlor, J., concurred.