[No. 13986. *En Banc*. March 6, 1917.]

THE STATE OF WASHINGTON, *on the Relation of the Board of Commissioners of Pierce County, Plaintiff*, v. C. W. CLAUSEN, *as State Auditor, Respondent.*[1]

COUNTIES—NATURE AND GOVERNMENT. Counties are created by the state under its sovereign right without the consent of the inhabitants' and legislative authority over them as administrative branches of governmental affairs is unlimited except as provided in the constitution.

TAXATION—LEGISLATIVE POWERS—DISCRETION—REVIEW. The power of taxation is an incident of sovereignty, and it is within the discretion of the legislature to compel a county to levy taxes in aid of state governmental purposes in support of the public defense, within constitutional limitations, and questions of state policy and necessity therefor are legislative questions over which the court has no control.

CONSTITUTIONAL LAW—STATES — POWERS — PUBLIC DEFENSE. The furnishing of a mobilization camp for the Federal soldiery in aid of the public defense, while a Federal purpose, is likewise a state duty to which the state may be called upon to contribute.

TAXATION—FOR PUBLIC DEFENSE—UNIFORMITY—STATUTES. Under article 10 of the constitution requiring the legislature to provide for the organization and disciplining of the militia in such manner as it

[1]Reported in 163 Pac. 744.

may deem expedient, the legislature may distribute the burden upon its political subdivisions as it sees fit.

SAME—UNIFORMITY—PURPOSES—PUBLIC DEFENSE — CONSTITUTION-AL LAW.   Chapter 3, Laws 1917, p. 2, compelling Pierce county to levy a tax for the purpose of acquiring a Federal mobilization training camp and supply station for the Federal army and other military organizations under the Federal government, is within the exercise of the sovereign power of taxation that may be imposed upon one county as an arm of the state government, exclusive of the balance of the state; and therefore does not violate Constitution, article 7, section 2, requiring uniformity of taxation; article 11, section 9, prohibiting the release or discharge of any county from its proportionate share of taxes for state purposes; article 2, section 28, subdivision 6, prohibiting the legislature from enacting special laws granting corporate powers or privileges; article 13, section 1, providing that state institutions shall be fostered and supported by the state; or article 11, section 12, prohibiting the legislature from imposing taxes on a county for county purposes.

SAME.   The taxation of the property of one county for the purpose of aiding the Federal government in the public defense does not fall within any constitutional prohibition, irrespective of any question of public duty to the state, where the local benefit therefrom to the county is not questioned but has been accepted by the legislature, by the board of county commissioners, and by the people of the county voting at an election held for the purpose of authorizing the levy.

Application for a writ of mandate, filed in the supreme court January 30, 1917.   Granted.

*Fred G. Remann* and *J. T. S. Lyle* (*Scott Z. Henderson, E. S. McCord, P. C. Sullivan,* and *Clinton W. Howard,* of counsel), for relators.

*The Attorney General* and *R. E. Campbell, Assistant, Glenn J. Fairbrook* and *C. E. Arney, Jr.,* for respondent, contended, among other things, that the bonds are issued in payment of a debt incurred for a purpose not a county purpose. *Yesler v. Seattle,* 1 Wash. 308, 25 Pac. 1014; *State ex rel. Lopas v. Shagren,* 91 Wash. 48, 157 Pac. 31; *People ex rel. Murphy v. Kelly,* 76 N. Y. 475; *Lancey v. King County,* 15 Wash. 9, 45 Pac. 645, 34 L. R. A. 817; *State ex rel. Clausen v. Burr,* 65 Wash. 524, 118 Pac. 639; *Stetson v. Kempton,* 13 Mass. 271; *State ex rel. Blakeslee v. Clausen,* 85 Wash. 260,

148 Pac. 28, Ann. Cas. 1916B 810; *Hubbard v. Fitzsimmons,* 57 Ohio St. 436, 49 N. E. 477. The bonds being issued for a state purpose, the taxes levied to pay the same are state taxes and they must therefore be levied uniformly throughout the state. *State ex rel. Frease v. Kreighbaum ex rel. Com'rs,* 6 Ohio Circuit Dec. 654; *State ex rel. Long v. Brinkman,* 7 Ohio Circuit Dec. 710; *Daniels v. Columbus,* 4 Ohio Circuit Dec. 293; *Wilder v. Daniels,* 53 Ohio St. 658, 44 N. E. 1150; *Wasson v. Commissioners,* 49 Ohio St. 622, 32 N. E. 472, 17 L. R. A. 795; *Hubbard v. Fitzsimmons,* 57 Ohio St. 436, 49 N. E. 477; *Bright v. McCullough,* 27 Ind. 223; *Loftin v. Citizens Nat. Bank,* 85 Ind. 341; *Board of Com'rs of Jackson County v. Shields,* 155 Ind. 604, 58 N. E. 1037; *Mayor etc. of Mobile v. Dargan,* 45 Ala. 310; *Hutchinson v. Ozark Land Co.,* 57 Ark. 554, 22 S. W. 173, 38 Am. St. 258; *Murray v. Lehman,* 61 Miss. 283; *Merrick v. Amherst,* 12 Allen 500; *State ex rel. Board of Education of Oshkosh v. Haben,* 22 Wis. 629; *Board of Supervisors of Livingston County v. Weider,* 64 Ill. 427; *State ex rel. Milton v. Dickenson,* 44 Fla. 623, 33 South. 514, 60 L. R. A. 539; *Taylor, McBean & Co. v. Chandler,* 9 Heisk (Tenn.) 349, 24 Am. Rep. 308; *Stetson v. Kempton,* 13 Mass. 271; *Sanborn v. Commissioners of Rice County,* 9 Minn. 273; *Merrill v. Humphrey,* 24 Mich. 169. No county can be released or discharged from any county proportionate share of taxes for state purposes. Const., art. 11, § 9. All moneys raised for state purposes must be paid in money into the state treasury. Const., art. 7, § 6. The act confers upon Pierce county powers not conferred upon other counties, in violation of Const., art. 11, § 4, requiring a uniform system of county government throughout the state. Chapter 3, violates the provisions of article 2, section 28, subdivision 6, state constitution, prohibiting the legislature from enacting a special law granting corporate powers or privileges. *Terry v. King County,* 43 Wash. 61, 86 Pac. 210; *State ex rel. Knisely v. Jones,* 66 Ohio St. 453, 64 N. E. 424, 90 Am. St. 592; *Cincinnati v. Trustees of Cincinnati Hos-*

*pital,* 66 Ohio St. 440, 64 N. E. 420; *Atchison v. Bartholow,*
4 Kan. 104; *State ex rel. Attorney General v. Cincinnati,* 20
Ohio St. 18; *Gilmore v. Norton,* 10 Kan. 491; *Wyandotte v.
Wood,* 5 Kan. 367; *State v. Lawrence,* 79 Kan. 234, 100 Pac.
485; *School District v. Insurance Co.,* 103 U. S. 707; *Clegg
v. School District No. 56 of Richardson County,* 8 Neb. 178;
*Commercial Nat. Bank v. Iola,* Fed. Case No. 3061. Chapter
3 violates provisions of article 8, sections 1, 2, and 3, state
constitution, limiting the indebtedness of the state. *State
Capitol Commission v. State Board of Finance,* 74 Wash. 15,
132 Pac. 861. Chapter 3 violates article 13, section 1, state
constitution, providing that state institutions shall be fos-
tered and supported by the state. *State ex rel. Blakeslee v.
Clausen,* 85 Wash. 260, 148 Pac. 28, Ann. Cas. 1916B 810.

Morris, J.—On January 6, 1917, a special election was
held in Pierce county at which the voters of that county
authorized the incurring of an indebtedness not exceeding,
exclusive of interest, the sum of $2,000,000, the proceeds of
such indebtedness to be used in acquiring approximately
70,000 acres of land in the county to be, when acquired,
conveyed to the Federal government for a permanent mo-
bilization, training, and supply station. The election re-
sulted in the casting of 25,049 votes in favor of, and 4,135
votes against, the proposition. For the purpose of removing
all legal obstacles to the incurring of this indebtedness, and
to insure the carrying out of its purposes by Pierce county,
as well as authorizing counties generally aiding such under-
takings, the legislature, at its 1917 session, enacted two
laws, herein referred to as chapters 3 and 4 of the Laws of
1917, pp. 2, 15. The first of these acts, chapter 3, is a com-
pulsory act applying to Pierce county alone; while the sec-
ond, chapter 4, is a voluntary act, applicable to any county
within this state. Subsequent to the passage of chapter 3,
the county commissioners of Pierce county accepted the pro-
visions of the act, under the authorization of the people as

expressed at the election, and for that purpose expressed their intention to incur an indebtedness not exceeding the sum of $2,000,000, exclusive of interest, and to issue and sell county bonds for the purpose of acquiring, by condemnation or otherwise, the 70,000 acres and conveying them to the United States for a permanent mobilization, training, and supply station. Thereafter the state board of finance entered into a contract with the board of county commissioners to purchase these bonds to the value of $50,000 and pay for the same out of the permanent school funds. The state auditor was directed to issue a warrant upon the permanent school fund in the sum of $50,000 in payment of these bonds, which he refused. Relator then came to this court and sued out this writ of mandate by which we are asked to compel the state auditor to issue his warrant in order that the same may be used in the purchase of these bonds as contemplated by the state board of finance. This calls for an examination into the legal sufficiency of these acts, since, if there is any valid law authorizing the issuance of these bonds by Pierce county, the duty of the state auditor is purely a ministerial one that can be controlled by an appropriate writ of this court.

A sufficient understanding of chapter 3 may be had from its title and sections 1 and 2 of the act, which are as follows:

"An Act imposing upon Pierce county, as an arm and agency of the state, an indebtedness not exceeding two million dollars, exclusive of interest, requiring such county to issue its negotiable bonds therefor, levy taxes to pay the same with interest, acquire by condemnation or otherwise, approximately seventy thousand acres of land in such county, and donate and convey the same to the United States for a permanent mobilization, training and supply station for any or all such military purposes, including supply stations, the mobilization, disciplining and training of the United States army, state militia, and other military organizations, as are now or may be hereafter authorized or provided by or under Federal law; conferring on such county the power of eminent domain for the purposes of this act; and providing procedure

therefor; granting the consent of the state to such convey-
ance and ceding exclusive legislative jurisdiction to the
United States over the lands so conveyed; declaring the ex-
istence of an exigency requiring the state and its govern-
mental agencies to aid the federal government and declaring
an emergency.

"*Be it enacted by the Legislature of the State of Wash-
ington:*

"Section 1.   Whereas, In the judgment of the legislature
of the State of Washington, an exigency has arisen demand-
ing the exercise of the sovereign power of the state to aid in
repelling invasion, suppressing insurrection and defending
the state in war, and

"Whereas, It is the duty of the state and its governmental
agencies to aid the national government to the full extent of
their means and ability; and whereas, the success or defeat of
the national government is equally the success or defeat of
the state, and

"Whereas, By the express mandate of article X of the
state constitution, it is made the duty of the legislature to
provide by law for organizing and disciplining the militia in
such manner as it may deem expedient not incompatible with
the constitution and laws of the United States, and

"Whereas, By acts of congress, including those approved
June 3rd, 1916, and August 29th, 1916, and regulations of
the war department, disciplining by the federal government
of the state militia (national guard) and other federal, state
and local military organizations, at mobilization, training
and supply stations is, among other things provided, which
method of disciplining the militia and other military organi-
zations is, in the judgment of the legislature, deemed expe-
dient and proper and not incompatible with the constitution
and laws of the United States or existing laws of this state,
and

"Whereas, The secretary of war, with the approval of the
President of the United States, deeming it expedient, has
agreed on behalf of the Federal government, to establish in
Pierce county, Washington, a permanent mobilization, train-
ing and supply station, for any or all such military purposes
as are now or may be hereafter authorized or provided by or
under Federal law, on condition that land in Pierce county
aggregating approximately seventy thousand acres, at such

location or locations as have been or may be hereafter, from time to time selected or approved by the secretary of war, be conveyed to the United States, with the consent of the State of Washington, free of cost to the United States, and

"Whereas, In the judgment of the legislature, the location of such permanent mobilization, training and supply station within the limits of Pierce county, Washington, will aid and be of public benefit and advantage to the nation and state in repelling invasion, suppressing insurrection, defending the nation and state in war, and disciplining the militia, in which general public benefit and advantage Pierce county will also proportionately share, but in addition to its general benefit, it will also enjoy additional and special benefits, with other local benefits and advantages not accruing to the nation and other counties in the state, to an extent exceeding the cost of acquiring by condemnation, or otherwise, the site selected or to be selected as aforesaid, aggregating approximately seventy thousand acres of land, and

"Whereas, In the judgment of the legislature, the site aforesaid can be acquired for not exceeding two million dollars, and

"Whereas, At a special election held in Pierce county on the 6th day of January, 1917, the voters of such county, by a more than three-fifths majority of those voting at said election, attempted to authorize the incurrence of an indebtedness of two million dollars, with interest, with which to acquire approximately seventy thousand acres of land in said county, and attempted to authorize such county to convey the same to the United States to be used as a permanent mobilization, training and supply station, for which attempted exercise of authority it is doubtful whether there was then in existence any law authorizing it, but the fulfilment of which purpose by Pierce county should, in the judgment of the legislature, be required by the state.

"Sec. 2.    That there is hereby imposed upon the county of Pierce, in the State of Washington, an indebtedness not exceeding, exclusive of interest, two million dollars, and the county commissioners of such county, acting as an arm and agency of the state, are hereby directed to incur an indebtedness not exceeding, exclusive of interest, two million dollars, with which such county, as an arm and agency of the state, is hereby required to acquire by condemnation or otherwise,

land in Pierce county, Washington, aggregating approximately seventy thousand acres, at such location or locations as may have been or may be hereafter from time to time selected or approved by the secretary of war (of the due making of which selection the determination of the county commissioners of such county shall be conclusive) and convey all of such lands to the United States to be used by the United States for any or all such military purposes, including supply stations, the mobilization, disciplining and training of the United States army, state militia, and other military organizations, as are now or may be hereafter authorized or provided by or under Federal law, said indebtedness to be evidenced by negotiable bonds of Pierce county, payable in not more than twenty years, with interest not exceeding five per centum per annum payable annually." Laws of 1917, ch. 3, p. 2, §§ 1, 2.

Section 1 of chapter 4 is the same as section 1 of chapter 3. Section 2 authorizes any county in the state to incur an indebtedness and issue its bonds for the purpose of acquiring lands to be conveyed to the Federal government whenever the secretary of war shall agree on behalf of the Federal government to establish in such county a permanent mobilization, training and supply station for military purposes. Section 23 of this act is in the nature of a validating statute, further providing that, where, under any law theretofore or thereafter enacted, the special duty of incurring an indebtedness for such purposes is imposed, compliance to the extent of such imposed duty may be had in whole or in part either under chapter 3 or chapter 4.

These acts are attacked by the *Attorney General*, representing the state auditor, as falling within many constitutional inhibitions. The principal argument as applied to chapter 3 is that it violates article 7, section 2 of the state constitution, requiring uniformity of taxation; article 11, section 9, prohibiting the release or discharge of any county from its proportionate share of taxes for state purposes; article 2, section 28, subdivision 6, prohibiting the legislature from enacting special laws granting corporate powers

or privileges; article 13, section 1, providing that state institutions shall be fostered and supported by the state; and article 11, section 12, prohibiting the legislature from imposing taxes on a county for county purposes.

In discussing these different constitutional objections, we shall not attempt to segregate them, but, inasmuch as the questions submitted call for a general treatment of the constitutional phases of state and county government and the powers and duties that the state may impose upon a county, we shall treat them together, endeavoring in the discussion as a whole to cover every phase of the question. To do this, it will be helpful to start out with a clear understanding of the nature of county government and the relation of the county government to the state.

Our constitution makes no special reference to county organizations as such other than to recognize them as legal subdivisions of the state, recognizing those counties existing at the time of the adoption of the constitution and providing for the organization of new counties by the legislature under certain restrictions. As local subdivisions of the state, counties are created by the sovereign power of the state of its own sovereign will without any necessary particular solicitation, consent or concurrent action by the people who inhabit them. They are created by the state under its sovereign and paramount authority with a view to the policy of the state at large, for political organization, and the administration of governmental affairs. With scarcely an exception, all the powers and functions of county organizations have a direct and exclusive reference to the general policy of the state and are, in fact, but a branch of the general administration of that policy. *Commissioners of Hamilton County v. Mighels*, 7 Ohio St. 109; *People ex rel. Deneen v. Martin*, 178 Ill. 611, 53 N. E. 309; *County Com'rs Talbot County v. County Com'rs Queen Anne's County*, 50 Md. 245; 1 Dillon, Municipal Corporations (5th ed.), § 34. This being so, it would seem to follow as a nat-

ural sequence that legislative authority over counties is unlimited except as that limitation is found in the state constitution.

With this understanding of the relation between the county and the state, it will again be helpful, since to a great extent we are dealing with a taxation problem, to ascertain the power of the state in imposing the burden of taxation upon the county. The power of taxation is an incident of sovereignty and is possessed by the state without being expressly conferred by the people. It is a legislative power, and when the people by their constitution create the department of government upon which they confer the power to make laws, the power of taxation follows as a necessary part of the more general power. *Northern Missouri R. Co. v. Maguire*, 20 Wall. (U. S.) 46; *Meriwether v. Garrett*, 102 U. S. 472. In the latter case, in which the aid of the Federal court was sought by creditors of the city of Memphis, Tennessee, to take possession, through a receiver, of the assets of the city, including collected but not appropriated taxes as well as uncollected taxes, with a view of applying them to the payment of the creditors' claim, the legislature of the state having passed acts repealing the charter of the city and withdrawing from it all power of taxation, remanding its territory to the government of the state and establishing taxing districts in the state, the court, in the course of its opinion, at page 515, in speaking of the power to levy taxes says:

"It is a high act of sovereignty, to be performed only by the legislature upon considerations of policy, necessity, and public welfare. In the distribution of the powers of government in this country into three departments, the power of taxation falls to the legislative. It belongs to that department to determine what measures shall be taken for the public welfare, and to provide the revenues for the support and due administration of the government throughout the state and in all its subdivisions."

Accepting this as the foundation principle from which we must proceed, it is the legislature that must determine all questions of state policy, necessity, and discretion in matters of taxation, not only in the levying of the tax, but in apportioning it. The judicial tribunals of the state have no concern with the policy of legislation. That is a matter resting altogether in the discretion of another coordinate branch of the government. The only power courts can exercise over matters of this kind is to demand that all constitutional limitations thrown around the taxing power be observed. When the legislature confines itself within the constitutional limitations, it is the supreme authority, and the courts and the people must obey. Having found the legislative body properly exercising the power of taxation, the next natural inquiry is to what extent and for what purpose that power may be exercised.

In *State v. Lawrence*, 79 Kan. 234, 100 Pac. 485, it was held that the legislature had the power to compel the city within which the state university was located to issue its bonds in aid of the university and to levy and collect a tax to establish a fund out of which such bonds might be paid. In so holding, the court deals with many of the constitutional objections here made, among them the provisions of the Kansas constitution requiring uniform taxation and an equal rate of assessment and prohibiting the passage of special acts conferring corporate powers. The first objection was disposed of by construing the constitution as only requiring a uniform and equal rate throughout the territory in which the tax is levied, and that the principle of equality is fully satisfied by making local taxation equal and uniform as to all property within the limits of the taxing district. This we conceive to be the general rule under similar constitutional provisions. *San Francisco v. Spring Valley Water Works*, 54 Cal. 571; *Bright v. McCullough*, 27 Ind. 223; *Merrick v. Amherst*, 12 Allen 500; *Washington v. State*, 13 Ark. 752; *East Portland v. Multnomah County*, 6 Ore.

62; *Wisconsin Cent. R. Co. v. Taylor County,* 52 Wis. 37, 8 N. W. 833.

Proceeding in its opinion, the court says:

"The city of Lawrence is required by the act to pay taxes for the support of the university which are not imposed upon the citizens of other parts of the state, but only to the extent which in the opinion of the legislature the city of Lawrence reaps a special benefit by the location of the university. In *Railroad Company v. County of Otoe,* 83 U. S. 667, 21 L. Ed. 375, the supreme court of the United States said: 'It is true the burden of the duty may thus rest upon only a single political division, but the legislature has undoubted power to apportion a public burden among all the taxpayers of the state, or among those of a particular section. In its judgment, those of a single section may reap the principal benefit from a proposed expenditure, as from the construction of a road, a bridge, an almshouse, or a hospital.' The bonds, if otherwise valid, were the obligations of the city of Lawrence, and section 1, of art. 11 of the constitution only requires that any taxes levied for their payment be assessed at a uniform rate upon all property in the city liable to taxation."

In dealing with the second constitutional objection, that the act was special, conferring corporate powers, the court points out the difference between a governmental and corporate or private function of a municipality, reaching the conclusion that, where the legislature enacts a law in the accomplishment of a governmental purpose, it is no objection to the validity of the law that it is special in form. Upon this point, it is said, at page 254:

"The legislature may require a municipal corporation or other constituent political agency of the state to perform any public duty which the state itself may perform."

Again, at page 255:

"The powers conferred by the act upon the city of Lawrence, therefore, were not corporate powers to be employed in the management and control of its local and internal concerns, which the city was primarily created to perform in

common with all other cities of its class, and in the performance of which it is the policy of the state to require a certain uniformity.   On the other hand, they were to be employed solely for the accomplishment by the state of a general purpose in which the people of the whole state were and are vitally interested.   The city was authorized to act, not for itself, but as an arm of the state government, in the doing of something expressly enjoined upon the legislature.   The legislature was free to employ any agency of the state government in carrying out its purpose." .

The governmental purpose of our constitution in this respect is found in article 10 requiring the legislature to provide for the organization and disciplining of militia in such manner as it may deem expedient.   The same rule is also announced in *State ex rel. Donham v. Yancy*, 123 Mo. 391, 27 S. W. 380, and in *State v. Darrah*, 152 Mo. 522, 54 S. W. 226.

In *Ransom v. Rutherford County*, 123 Tenn. 1, 130 S. W. 1057, Ann. Cas. 1912B 1356, an act empowering municipalities or counties to issue bonds in aid of state normal schools located therein was sustained upon reasoning that, while the establishment of state educational institutions was a state purpose, the local benefit was sufficient to sustain the burden of the local tax, citing the following cases where like burdens were imposed by the legislature upon municipalities: *Marks v. Trustees of Purdue University*, 37 Ind. 155; *Burr v. Carbondale*, 76 Ill. 455; *Merrick v. Amherst, supra; Hensley Township v. People ex rel. Bailey*, 84 Ill. 544; *Livingston County v. Darlington*, 101 U. S. 407.   Like additional cases are:   *Gordon v. Cornes*, 47 N. Y. 608; *Turner v. Hattiesburg*, 98 Miss. 337, 53 South. 681; *Read v. Plattsmouth*, 107 U. S. 568.   In the last case cited, it was said:

"What the State might properly have done by direct action it may do through the public agency of a municipal body, such as the city of Plattsmouth, which, in the performance of the duty assigned, does not so much exercise a corporate power of its own as discharge a function of the state."

In Gibson v. Mason, 5 Nev. 283, an act was sustained imposing a tax upon a county to be applied in payment of railroad bonds, reasoning that the power to tax was purely a legislative power and that, in the exercise of this power, the legislative will was supreme within the constitutional restrictions.

In State v. Com'rs of Shawnee County, 28 Kan. 431, Brewer, J., in sustaining an act casting the cost of a state road upon the two counties in which the road was to be constructed, says:

"Third, we remark, that while the road is open to the use of all citizens from all parts of the state, it is yet of special benefit and value to the county upon which the burden of its establishment is cast. There is no casting upon one community the burden of a public enterprise which is specially beneficial to the citizens of some other community. It is not like an attempt to tax the citizens of Topeka with the cost of improving the streets of Lawrence. It simply casts upon the counties of Shawnee and Jefferson the cost of roads wholly within their territorial limits, and it is making each county bear the burden of public improvements within such limits. . . .

"And finally we remark that counties are purely the creation of state authority. They are political organizations, whose powers and duties are within the control of the legislature. That body defines the limits of their powers, and prescribes what they must and what they must not do. It may prescribe the amount of taxes which each shall levy, and to what public purpose each shall devote the moneys thus obtained. It may require one county to build a certain number of bridges at certain specified places, and of a particular size and quality. It may require another to open roads in given localities, and another to build a court house and to levy a tax to a prescribed amount for the purpose of paying therefor. In short, as a general proposition all the powers and duties of a county are subject to legislative control; and provided the purpose be a public one and a special benefit to the county it may direct the appropriation of the county funds therefor in such manner and to such amount as it shall deem best."

In *Hodgdon v. Haverhill*, 193 Mass. 406, 79 N. E. 830, a statute was enacted which directed the municipality in which the state armory was located to pay the annual interest on bonds issued by the state for the erection of the armory and to establish a sinking fund for the final payment of the bonds. The law was attacked as unconstitutional, the argument being that the maintenance of the militia and the construction of an armory were for the protection of the entire state and not for the special benefit of the city in which it might happen to be located. The court pointed out that, in dealing with questions of this character, the legislature might prescribe what shall be done and require cities and towns to bear the expense to any extent it might determine.

The Federal supreme court, in *County of Mobile v. Kimball*, 102 U. S. 691, sustained county harbor bonds over the objection that the act fastened upon one county the burden of an improvement for the benefit of the whole state. In meeting this objection, it was said:

"Assuming this to be so, it is not an objection which destroys its validity. When any public work is authorized, it rests with the legislature, unless restrained by constitutional provisions, to determine in what manner the means to defray its cost shall be raised. It may apportion the burden ratably among all the counties, or other particular subdivisions of the state, or lay the greater share or the whole upon that county or portion of the state specially and immediately benefited by the expenditure."

Many other cases announcing like rules based upon like reasoning have been examined. Among them may be cited as announcing the doctrine we are seeking to establish: *Simon v. Northup*, 27 Ore. 487, 40 Pac. 560, 30 L. R. A. 171; *McMahan v. Olcott*, 65 Ore. 537, 133 Pac. 836; *Sisk v. Cargile*, 138 Ala. 164, 35 South. 114; *Stoppenback v. Multnomah County*, 71 Ore. 493, 142 Pac. 832; *Moriarty v. New York*, 142 App. Div. 717, 127 N. Y. Supp. 524; *Sacramento v. Adams*, 171 Cal. 458, 153 Pac. 908; *State v. Freeman*, 61 Kan. 90, 58 Pac. 959, 47 L. R. A. 67; *Horton*

v. Andrus, 191 N. Y. 231, 83 N. E. 1120; Shelby County v. Tennessee Centennial Exposition Co., 96 Tenn. 653, 36 S. W. 694, 33 L. R. A. 717; State ex rel. Haberlan v. Love, 89 Neb. 149, 131 N. W. 196, Ann. Cas. 1912C 542, 34 L. R. A. (N. S.) 607; Cooley, Taxation, 153.

Sacramento v. Adams, supra, is an interesting and instructive case upon the point here involved. It was there held that no constitutional inhibition would prevent the city of Sacramento from issuing bonds and taxing its people for the purpose of acquiring land to be absolutely donated to the state for the erection thereon of state buildings, citing as authority Lancey v. King County, 15 Wash. 9, 45 Pac. 645, 34 L. R. A. 817. These cases establish the law in harmony with the principle that all power is inherent in the people of the state and that the people may exercise that power either through their own initiative or through their chosen representatives, except in so far as they have limited themselves in their own constitution or granted powers to the Federal government; that the legislature in its representative capacity, save for the same exceptions, controls the exercise of the taxing power, and may in its discretion say what burdens of taxation shall be borne by the people as a whole or by the inhabitants of any political subdivision of the state; that the county, as a political subdivision of the state, may not escape the burden of special taxation upon the ground that the burden of taxation imposed upon it is for the maintenance or support of a state purpose or a state institution when the county is the recipient of a peculiar benefit not enjoyed by the state at large. These principles have been referred to as establishing and supporting the law in harmony with our own decisions, to which we now refer.

In Lancey v. King County, supra, we had before us the constitutionality of the act of 1895, granting to and prescribing the power of King county in constructing the Lake Washington canal, an undertaking projected by the Federal government. The strongest attack made upon the act was

upon the ground that it called for the exercise of the state's power of eminent domain for the use and benefit of the Federal government. In passing upon this objection, the court called attention to the fact that, while it was proposed to convey the right of way for the canal to the Federal government, the improvement was for the use and benefit of the general public and to a greater degree for the benefit of the people of King county, and that the character of the work as a local improvement directly connected with the commercial affairs of the citizens of the county could not be taken away from it even though the undertaking had a great value to the Federal government for naval and other purposes.

In *Meehan v. Shields*, 57 Wash. 617, 107 Pac. 835, it was held that the constitutional provision requiring uniformity of taxation was not violated by a state aid road law requiring a division of the cost between the state, the county and the local road district, since each received a special benefit in proportion to the tax paid.

In *Bilger v. State*, 63 Wash. 457, 116 Pac. 19, we considered another legal phase of the Lake Washington canal, holding that the state could lend its aid to the enterprise undertaken by the Federal government and that there is no constitutional objection to the levying of an assessment by the county upon property specially benefited by a public improvement of this nature.

In *Blaine v. Hamilton*, 64 Wash. 353, 116 Pac. 1076, 35 L. R. A. (N. S.) 577, the right of the county to tax itself for harbor improvements was recognized upon the same theory of special benefits.

Next came *State ex rel. Clausen v. Burr*, 65 Wash. 524, 118 Pac. 639, attacking the state bureau of inspection act imposing the expense of auditing public accounts upon the several taxing districts throughout the state upon the ground that it was violative of article 11, section 12, forbidding the legislature from imposing taxes upon counties and other municipal corporations for county, city and other

municipal purposes.   The opinion proceeds upon the theory that the state is empowered to provide a system for uniformity of public accounts; that each political subdivision of the state was but a department of the state subject to state control and regulation in matters of taxation and that, in those matters which do not concern the people of the municipality alone but are united to those larger matters affecting the people of the entire state, the state can enforce any scheme looking towards its general welfare and compelling the municipality to bear the burden of those things which are sub-. jects of general concern to the people of the entire state; that among these matters of public concern are roads that are of state importance, systems of public instruction, administration of justice and preservation of public health and peace.   Two of the judges dissented upon certain grounds but the dissenting opinion concedes the point herein involved that the state may levy taxes upon counties for state purposes.

*Rands v. Clarke County,* 79 Wash. 152, 139 Pac. 1090, sustains against any constitutional objection the issuance of Clarke county bonds to pay its part of the cost of the interstate bridge built jointly by Clarke county, Washington, and Multnomah county, Oregon.

In *Johns v. Wadsworth,* 80 Wash. 352, 141 Pac. 892, reference was made to the holding in *State v. Robinson,* 35 Neb. 401, 53 N. W. 213, that, as a general rule, the legislature is authorized to determine what purposes are matters of public concern so as to justify taxation, to which this court added that this would be "true if the only limitation in the constitution was that the appropriation should conduce to the public welfare."

*In re Salary of Superior Court Judges,* 82 Wash. 623, 144 Pac. 929, sustains a statute permitting counties of the first class to increase the salaries of superior court judges as fixed by the state, such increase to be borne entirely by the counties, upon the ground that the superior courts serve both

a state and county purpose and render both a state and county benefit.

*State ex rel. Case v. Howell,* 85 Wash. 281, 147 Pac. 1162, sustains the doctrine that counties are auxiliary to the state and that the legislature in the exercise of its police power may impose upon them burdens which have relation to the preservation of public peace and safety or the promotion of the general welfare.

*State ex rel. Lopas v. Shagren,* 91 Wash. 48, 157 Pac. 31, in passing upon the official status of game wardens, recognizes the power of the legislature to impose upon the several counties of the state the duty to protect the game within the respective counties and the burden of maintaining the game wardens, notwithstanding the fact that they are state offices.

These cases from our own state are in harmony with those from other states earlier cited to the effect that the legislature may impose upon a county the full burden of an indebtedness for a purpose which, though of a general nature and for the benefit of the whole people, combines with these purposes others that are essentially a special benefit to the county.

The case of *Terry v. King County,* 43 Wash. 61, 86 Pac. 210, held an act authorizing the counties of King, Pierce, and Spokane to create an indebtedness for the purpose of acquiring sites for and the construction of state armories to fall within the constitutional inhibition of a special act creating corporate powers. The opinion is not based upon the holding that the construction of state armories is a corporate purpose because the subject of the act is a state armory, but seems to rest upon the theory that the act confers new powers and privileges not theretofore conferred and not extended to any other county in the state, and hence the act was special. The only contention presented by appellant in that case was that, inasmuch as these three counties were already empowered to issue and sell bonds, which power was asserted to be a corporate power, no new power was conferred in pro-

viding for the issuance of armory bonds. No comment was made by either counsel or court as to any distinction between governmental and corporate powers, and the case seems to have progressed upon a mutual concession that the power dealt with was a corporate power. As we now view it, we would not now hold that building an armory was exercising corporate powers for purely county purposes. It seems to us that the building of an armory falls within those higher and sovereign powers which the state exercises for the protection and welfare of all its citizens, and that among the governmental powers exercised by a sovereign state there are none higher than those which it exercises for the public safety and general welfare of the state. These views were neither urged upon nor considered by the court in the *Terry* case, and we cannot, for this reason, regard that case as in anywise controlling upon questions calling for the expression of an opinion as to the extent to which the state may go in exercising its sovereign governmental powers for the benefit of all its citizens and imposing the burdens of that power upon any of its political subdivisions in the discharge of the duty that political subdivision owes to the state to contribute to its public safety and general welfare.

The purposes of chapter 3, as expressed in its title and sections 1 and 2, leave no doubt that this act falls within the underlying principle of the cited cases both from within and from without this state. While the mobilization and training of the Federal soldiery to aid in the suppression of insurrection or the repelling of invasion is in a sense a duty of the Federal government, it is likewise a state duty to which the state may be called upon to contribute its aid. The mobilization and training of a state militia may be a state purpose, but it is likewise a public purpose to which every political subdivision of the state may be called upon to contribute to the full extent of its power and ability. So that, whether we regard the duty of the state to aid the Federal government as a state purpose or the duty of mobilizing and

training state militia and other like military organizations as a state purpose, the state, acting through its legislature, is fully empowered to distribute this burden to its political subdivisions as the legislative body may determine.

Upon the feature of local benefit, there would seem to be no question. We have no doubt that the people of Pierce county are as patriotic as the people of any county in the state and would tax themselves to any extent to aid either the Federal government or the state in matters of military necessity; but we also know that the people of Pierce county, in subjecting themselves to the burden of this tax, considered the local benefit to them in having this station located within Pierce county, a benefit which they deemed equal to the burden entailed, and because of this they are willing to assume the entire burden. We have, then, an expression from the legislature, from the county commissioners, and from the people themselves, that the purposes enumerated in chapter 3 are not only state purposes of the highest sovereign character carrying the right to exercise the taxing power for its accomplishment, but that they embrace and carry with them local benefits of such a nature that, irrespective of any question of duty, the people have willingly assumed the burden as one that carries its own recompense. These views sustain chapter 3 as falling within no constitutional prohibition. This is all that need be found to order the issuance of the writ. For that reason, we do not pass upon the legal status of chapter 4.

Let the writ issue.

ELLIS, C. J., WEBSTER, MAIN, PARKER, and MOUNT, JJ., concur.

HOLCOMB, J. (concurring)—I concur in the result (that the writ should issue). My concurrence is based chiefly on the ground that chapter 4 of the Laws 1917, p. 15, which is a permissive act, authorizing in general terms the voluntary assumption of such burdens as are here involved, and almost

exactly parallel with the act of 1895 (Laws 1895, ch. 2, p. 1), granting power to any county to assist the Federal government in the construction of "any national public work which would be of general public [and of local special] benefit," is more in harmony with the spirit and letter of our special constitutional provisions involved.   The act of 1895 was sustained in *Lancey v. King County*, 15 Wash. 9, 45 Pac. 645, 34 L. R. A. 817.   Such a disposition would not necessitate running counter to the decision in the *Terry* case.

CHADWICK, J. (concurring)—I concur in the conclusion reached by my associates, but I cannot subscribe to some of the reasoning employed to sustain the decision.

As stated in the opinion, the legislature passed two bills, each designed to accomplish the same end.   Chapter 3, Laws 1917, p. 2, was drawn upon the theory that the state had power to put the burden imposed by the act upon the county as a political subdivision of the state—that is, that the thing to be accomplished is a state function.   This act, counsel have denominated, for convenience, the involuntary or compulsory act.

The other, chapter 4, Laws 1917, p. 15, was drawn upon the theory that the purchase of the land for the army post is a municipal or county function and might, with the sanction of the legislature, be voluntarily assumed by the county. This is called the voluntary act.

Chapter 4 may be quickly disposed of.   The thing to be done is, in no sense, a county function, nor can it be made such by any process of reasoning or without doing violence to every constitutional provision pertaining to counties, or to the general and special powers of taxation.   I recognize it as no more than an attempt to save the question in the event the courts should hold chapter 3 to be an unlawful assumption of power on the part of the state.   The attempt is abortive, and chapter 4 has no place upon the statute books.

Chapter 3 is, however, an act to which no legal objection can be urged. It rests upon a principle which is deeply rooted in the first and great object of government—that is, the maintenance of sovereignty. All constitutions are limitations upon the power of the agents of the people, but there never was a written constitution which delegated to functionaries all the latent powers which lie dormant in every state or nation. They are boundless in extent and are incapable of exact definition. These powers have been referred to as the sovereign powers of the state, the inherent powers of the state, and as powers incident to the exercise of powers specifically granted, *i. e.*, implied powers.

An instance of the recognition of the power, which exists whether provided in the constitution or no, may be found in our own books—that is, the right of the state to take property for a public use. The right to take is acknowledged as inherent; as an attribute of sovereignty. *Gasaway v. Seattle*, 52 Wash. 444, 100 Pac. 991, 21 L. R. A. (N. S.) 68; *Samish River Boom Co. v. Union Boom Co.*, 32 Wash. 586, 73 Pac. 670. Upon this power the people have put a limitation. The state will not take without compensation first ascertained and paid. *Kincaid v. Seattle*, 74 Wash. 617, 134 Pac. 504, 135 Pac. 820; *State ex rel. Long v. Superior Court*, 80 Wash. 417, 141 Pac. 906. The point I would make is that there is no limitation upon the power of the state to impose the duty prescribed in chapter 3.

I think the earliest definition of sovereignty to be found in our books is that of Jay, the first Chief Justice of the United States. In *Chisholm v. Georgia*, 2 Dallas, at page 471, he says: "Sovereignty is the right to govern." I shall not follow the many definitions to which resort might be had with profit but will come to the principle controlling this case at once. If sovereignty is the right to govern, sovereignty is also the right to maintain government; to protect our institutions as well as our people from insurrection and re-

bellion at home, and from the hazard of possible invasion by a foreign foe.

The power of the state as an agency of the Federal government is not questioned. If the state has such power, it follows that it can, in the absence of an express limitation, exercise its power through the mediumship of any of its instrumentalities. A county is a political subdivision of the state, created by the state under the sovereign power to govern, and to maintain government. As is said in the opinion, the state can arbitrarily select a geographical area and impose upon those who reside within it certain duties. An imposition of duty not limited in certain terms cannot be questioned if it rests in the inherent power of the state. It is so in this case. To aid in the public defense, the state has assumed to exercise a public duty and has done no more than to provide a convenient agency. The only possible argument against the right of the state to impose this burden is based upon article 7, § 2 of the state constitution requiring uniformity of taxation. To meet this and other objections which I shall not now notice, it is urged by counsel that, because of the peculiar local benefit to be enjoyed by Pierce county, the act is not objectionable. In my opinion, the argument is unsound. The conclusion admits the falsity of the premise. The argument, in its last analysis, is that the act *does* impose an unequal tax on a political subdivision of the state, *but* because of some benefit which it is supposed the citizen of Pierce county will enjoy over the citizen of adjoining or other counties, the unlawful imposition is balanced and the constitution no way trenched upon; that is to say, the mandate of the constitution is not to be observed if those interested as individuals are likely to reap some profit from its nonobservance. It is my judgment that section 2 has no application to the case before us. Section 2 is a part of article 7, entitled, "Revenue and Taxation." "The legislature shall provide by law a uniform and equal

rate of assessment and taxation on all property in the state . . ."

This section does not stand apart as an axiom. It must be read in connection with other sections of article 7, and other articles. When read with § 1 of art. 7, we find the kind of revenues for which the tax imposed must be uniform. The *extraordinary* tax provided in chapter 3 is not within the terms or intent of § 1, which reads:

"The legislature shall provide by law for an annual tax sufficient, with other sources of revenue, to defray the estimated ordinary expenses of the state for each fiscal year. And for the purpose of paying the state debt, if there be any, etc."

By article 8, § 2, the legislature is given power:

"In addition to the above limited power to contract debts, the state may contract debts to repel invasion, suppress insurrection, or to defend the state in war, but the money arising from the contracting of such debts shall be applied to the purpose for which it was raised, and to no other purpose whatever."

Thus it will be seen that the tax here imposed does not fall within the class of taxes which must be uniform, but rather falls within the power to contract debts for public defense upon which no limitation whatever has been placed.

There should be no question of taxation in the case, but if it were so, the objection could be further answered by saying that the state could now or hereafter impose a like duty upon any other political subdivisions, or upon two or more. For instance, to build a military road through a particular county or counties at the cost of the counties traversed; to plant mines in a harbor in one or more counties; or to fortify public works in a particular county, thus maintaining the theory of uniformity.

If the right to exercise the right of public defense rests upon special benefits, it might, in my opinion, be seriously questioned whether the act ought to be sustained, for the

real benefit is general to the state and the special benefit but incidental to the county. But if we rest our decision in the sovereign power of the state and that alone, no such question can arise. It is a curious anomaly to say that the state has power to compel Pierce county to buy land for the purpose of public defense, and then support the holding by saying that the exercise of the power can only be sustained upon "consideration."

Sovereignty rests upon no such flimsy foundation. It takes no consideration of benefits. It implies sacrifice. It imposes duty. It measures not in dollars and cents, but in peace, good order, and the common good. It looks only to the perpetuity of our institutions as they have been defined in our constitutions and in the hearts of men.

It may be said that these observations are not sound unless we be in actual state of war; in other words, under martial law. But I am unwilling to subscribe to such doctrine. If the right would then exist, it exists now. The right to meet imminent danger sustains the right to prepare for danger. The first inherent power of a sovereign state is to protect. To protect, it must prepare. The law of self-preservation is, to the individual, the first law of nature. Society is but an aggregate of individuals. In the instant case, the state, in its sovereign capacity, has asserted the law of self-defense, the right of self-preservation.

Sovereignty may be variously defined, depending upon the nature of its assertion, and I would say with Vattel, if "the rights of a nation spring from its obligations," that our inquiry may end with the assertion that sovereignty in a state or nation is the right of self-preservation.

I regret that the time elapsing between the preparation of the majority opinion and the time when it ought to be filed is so short that I cannot more clearly define my position by resort to the works and words of others. But I believe the underlying thought of chapter 3 to be no more than a restatement of the first and fundamental principle upon which

organized government rests, and for that reason, I refuse to subscribe to a doctrine that would reduce the right of a sovereign state to perform an act of common prudence to the level of a street assessment resting upon the law of pecuniary benefit.

The writ should issue.