(41 Misc. Rep. 559.)

### HOLLISTER et al. v. CITY OF ROCHESTER.

(Supreme Court, Special Term, Monroe County. November, 1903.)

1. MUNICIPALITIES—EXTENSION OF BOUNDARIES.
    The Legislature has the power to extend the limits of an existing municipality by annexing territory thereto, though such territory will receive no benefit from incorporation in return for the burdens thereby imposed upon it, and although the annexed territory is thereby rendered liable for pre-existing debts of the municipality.

2. SAME—IMPROVEMENTS—LIABILITIES OF ANNEXED TERRITORY.
    The owners of certain lots of the west side of a city street, which was the east line of the city limits, petitioned for the paving of the street, and the owners of the lots on the east side of the street promised to pay therefor ratably. The city under a statute annexed the lots on the east side of the street. Held, that the city had the power to assess such lots for the cost of the contemplated improvement, and could recall the assessment already made, and make a new one, assessing the lots on both sides of the street.

3. SAME.
    Where the limits of a city included lots on one side of a street, and the city prepared to pave such street, and after an assessment was made

therefor persons purchased the lots on the other side of the street, and such lots pending the improvement were annexed to the city, and a reassessment was made on the property on the street including that so annexed, the owners of the lots so bought were not exempt from assessment.

Proceedings by Emily J. Hollister and others against the city of Rochester to set aside an assessment. Assessment sustained.

Reed & Shutt, for Emily J. Hollister and others.
John P. Bowman, for Fannie G. Gregory.
William Neary, for Caroline A. Mosher.
John F. Kinney, for William F. Shafer and others.
Walter S. Hubbell, in pro. per.
William A. Sutherland, Corp. Counsel, for city of Rochester.

NASH, J. These are proceedings brought to vacate and set aside an assessment of the expense of paving and improving South Culver street. It appears that in May, 1894, the east line of the city ran through the center of South Culver street from East avenue southerly to the Erie Canal Bridge. In that month the owners of lots within the city limits on the west side of the street petitioned the common council to improve the street by paving the same the full width thereof, and at about the same time the owners of lots on the east side of the street without the city limits and within the town of Brighton presented their petition in writing to the common council, reciting that the petitioners were the owners of all the real estate fronting upon the easterly side of that part of South Culver street sought to be improved, and of about two-thirds of the real estate fronting upon the westerly side thereof, praying the common council to cause the improvement to be made in the manner set forth in the petition, and stating that, if their petition should be granted, the petitioners would pay one-half of the expense of the improvement proportionately according to the number of feet front owned by them, respectively, on the easterly side of the street. In the same month of May, 1894, the common council acted upon these petitions, and adopted its first ordinance for the improvement of the street, and "upon the theory that the petition signed by the residents of the city of Rochester, when read in the light of the petition signed by the property owners of Brighton, authorized the assessment of the entire expense of the improvement upon the property upon the Rochester side of the said Culver street, leaving the property owners thus assessed to collect one-half of such assessment from the petitioners owning property on the Brighton side of South Culver street," the entire expense of the improvement was therein directed to be assessed upon the lots on the west or city side of the street. The street was improved during the summer of 1895, and completed and accepted by the executive board of the city in October, 1895, and thereafter, in July, 1896, the common council confirmed the assessment roll, and the entire cost of the improvement was assessed upon the lots on the west side of Culver street. Thereafter, one of the owners of lots assessed on the west side of the street having brought an action against the city to vacate and annul

the assessment, the common council, in December, 1901, recalled the said assessment roll, and vacated and set the same aside as illegal and void. In the meantime the easterly boundary of the city had been extended, by an act of the Legislature passed in May, 1895, so as to take into the city the lands of the petitioners owning lands on the east side of Culver street, and in May, 1902, the common council by resolution recalled said former assessment, and by an ordinance finally adopted in February, 1903, made a new assessment, amending the former assessment by directing an assessment of the expense of the improvement upon the lots on both sides of Culver street, including all the lots and parcels of land owned by the original petitioners to the common council at the time of presenting their petition in 1894, except one parcel of land which had not been taken into the city, and as to that lot the corporation counsel was directed to collect of the lot owner pursuant to the original petition and agreement to pay the proportionate amount of the cost of the improvement.

The power and authority of the common council to levy an assessment to defray a proportionate part of the expense of the improvement upon lands of the petitioners in these proceedings owning lots and parcels of land fronting on the east side of Culver street, under the new or amended ordinance adopted in February, 1903, depends, I think, upon the power and authority which the common council had upon the completion of the improvement in 1895. The Legislature during the progress of the work extended the boundaries of the city so as to include the lands in question within the city limits, thereby bringing the lands of the petitioners within the jurisdiction of the common council. In the annexation of territory the Legislature has the power to extend the limits of an existing municipality by annexing territory thereto, although such territory will receive no benefit from incorporation in return for the municipal burdens thereby imposed upon it, and although the annexed territory is thereby rendered liable for the pre-existing debts of the municipality. 20 Am. & Eng. Encyc. of Law (2d Ed.) 1152. Upon this principle, and by so much the stronger reason, is the rule applicable where the annexed territory has been improved by the municipality upon the petition of the owners and an agreement that their lands may be assessed proportionately for the improvement. It follows that the common council had the power, upon the completion of the improvement in 1895, to assess a proportionate part of the expense of making the improvement upon the lots of the petitioners fronting on the east side of Culver street; and therefore, in making the new or amended assessment for the purpose of correcting the previous illegal and erroneous assessment, ample authority for which is found in section 215 of the charter of the city at the time of the improvement, it was proper to include therein the lots and parcels of land of the petitioners situate on the east side of Culver street.

It is urged that some of the petitioners in these proceedings became purchasers of their lots after the improvement was made, without notice of the lien of the assessment or knowledge that the assessment for the improvement had not been paid, and therefore, as bona

'fide purchasers, the assessment of 1903 should be held invalid as to them. This question is disposed of in Matter of Deering, 14 Daly, ·89, 95, affirmed 105 N. Y. 667, in which case Judge Bookstaver said:

"The learned counsel for the appellant contends that since the settlement ·of the Brown controversy the ownership of the lots affected by this assessment has been changed several times over, and that these owners have assumed the assessment had been paid long before they became purchasers, and that to compel them to pay for the work now would be unjust. We fail to understand why the purchasers, since the settlement, should have made this assumption, rather than those who purchased before the settlement, or why either class should have made the assumption at all, when the improvement was patent to all who saw the lots, and when it could have been easily ·ascertained by proper inquiry whether the assessment had been made and paid. If they failed to make this inquiry, they, under the circumstances, ·should suffer, and not the city."

The petition of the Leighton Lea Association and other petition- ·ers, and their agreement to pay proportionately one-half of the expense of the improvement, could doubtless have been enforced as a contract; but the city was not remitted solely to the enforcement ·of the personal obligation of the petitioners. Their petition and sub- ·sequent legislation had the effect of charging lands with the expense ·of the improvement. The dealings of members of the Leighton Lea Association with the association were matters exclusively within their own control, and could not in any way affect the interests of the city. It had the right to proceed against the lots benefited.

The charter does not fix any time within which a new or amended assessment for the purpose of correcting an erroneous or illegal assessment may be made. And under the authorities laches cannot be imputed to public officials so as to affect the rights of the city or the taxpayers at large. It was proper, therefore, to include in ·the assessment interest which had been paid or which had accrued upon the orders, certificates of indebtedness, or notes issued by the city to pay the expense of the improvement, as provided by the charter.

The point is made that the interest included in the assessment is largely in excess of the amount authorized by law. Counsel may be heard further upon that° point, and, if so advised, petitioners may ·offer further proof.

Ordered accordingly.