[Nos. 28973, 28974, 28975. *En Banc.* May 15, 1943.]

WHEELER SCHOOL DISTRICT No. 152 *et al., Respondents,*
v. C. A. HAWLEY, *as County Superintendent of
Schools, Appellant.*

RUFF SCHOOL DISTRICT No. 25-104 *et al., Respondents,*
v. C. A. HAWLEY, *as County Superintendent of
Schools, et al., Appellants.*

RUFF SCHOOL DISTRICT No. 25-104 *et al., Respondents,*
v. C. A. HAWLEY, *as County Superintendent of
Schools, Appellant.*[1]

[1]Reported in 137 P. (2d) 1010.

*Lowell B. Vail, James F. Wickwire, Howard E. Phillips, B. H. Kizer, Miller & Miller, The Attorney General, Fred E. Lewis, Thomas G. McCrea,* and *S. Harold Shefelman, Assistants,* for appellants.

*Ott & Cross* and *Norman G. Booth,* for respondents.

BLAKE, J.—These actions challenge the constitutionality of the Laws of 1941, chapter 248, p. 833 (Rem. Supp. 1941, § 4709-1 *et seq.*), entitled:

"AN ACT relating to education; defining terms; providing for county committees and a state committee for the reorganization of school districts; defining the powers and duties of County Committees and the State

Committee; prescribing duties of county and state officers; providing for boards of school directors in reorganized school districts; providing for appeals; providing for the classification of reorganized school districts; and making an appropriation."

Before referring to the facts of the typical case, we shall summarize what we regard as the salient features of the act. Its declared purpose is the formation of new school districts and the alteration of the boundaries of established districts in order to provide "a more nearly equalized educational opportunity for pupils of the common schools, a higher degree of uniformity of school tax rate among districts, and a wiser use of public funds. . . ." To that end, there is created what is known as the "county committee," to consist of not less than seven nor more than thirteen "representative citizens of the county," and "a state committee . . . composed of nine members."

The act requires that the county committee be "appointed within one and one-half (1½) years after the effective date of this act by the County Superintendent of Schools and one person from each school district in the county selected by the Board of Directors of such districts." Upon the county committee is imposed the duty to submit to the state committee "a comprehensive plan for the reorganization of school districts within the county." In the preparation of such plan, the county committee is required to give due consideration to the educational needs of local communities; to the future use of existing school buildings, sites, and playfields; to the convenience and welfare of pupils; to economies in transportation and administration costs; to a reduction in disparities in per-pupil valuation among school districts; to the equalization of educational opportunity of pupils; and to any other matters which, in its judgment, are of importance.

Where it is proposed to form a new district or transfer territory of one district to another, the committee is

required to hold public hearings upon due notice and receive *"testimony offered by any person or school district interested in any [such] proposal."* (Italics ours.) The scope of the hearing is very broad, being designed to ascertain the assets and liabilities of the various districts affected "and to make an equitable adjustment of all property, debts, and liabilities among the districts involved."

Having formulated a "comprehensive plan," the county committee is required to submit it to the state committee for approval. The state committee consists of nine members appointed by the state board of education. The state committee is required to "receive, file, and examine the plans for the reorganization of school districts" and to approve them "when they are found . . . to provide for a satisfactory school district system for the counties and the state, and for an equitable adjustment of property, debts, and liabilities." If the plan is not satisfactory, or if it is not "fair and equitable," the state committee is required to so notify the county committee, and, upon request of the latter, to assist in revising it.

Upon receipt of the approved plan from the state committee, the county superintendent of schools is charged with the duty of submitting it at a special election to the voters residing within the territory of the proposed new district. The act requires that the notices of election shall contain a description of the boundaries of the proposed district and a statement of the terms of adjustment of property, debts, and liabilities. The county superintendent is also required to organize and establish the district "if a majority of all votes cast by the electors residing within the boundaries of [the] proposed new district are in favor of [its] formation."

The act provides for an appeal to the superior court of the county in which the school district is situated "on any question of adjustment of property, debts, and

liabilities among the districts involved"; and the court, in case it finds the terms of the adjustment inequitable, "shall make an adjustment that is equitable."

The act provides that the life of both the state and the county committees shall be limited to four years, unless, in the judgment of the state committee, an "extension is necessary to the complete and satisfactory performance of the duties imposed upon said Committee by this act." In such case, it is provided that the state committee make a recommendation to that effect to the state board of education; and if, in the judgment of the board, such extension is necessary or advisable, it "shall so recommend to the Legislature."

It is provided that the boundaries of school districts established pursuant to the terms of the act shall not be altered within a period of five years of such establishment except upon recommendation of the county superintendent and the approval of the county and state committees.

There are other features of the act which it is unnecessary to summarize, since, in our opinion, they are unessential to a disposition of the questions presented on these appeals.

The cases were tried in the lower court on agreed statements as to the facts, which were, in effect, admissions by the defendants of the ultimate facts alleged in the complaints. While the complaints differ in some respects, that in the case of *Wheeler School Dist. No. 152 v. Hawley* (No. 28973) is typical. The action was brought by the district and two resident taxpayers of the district to enjoin Hawley, the county superintendent of schools of Grant county, from organizing and establishing a proposed new school district. From the complaint and the agreed statement of facts, it appears that, pursuant to the provisions of the Laws of 1941, chapter 248, p. 833 (Rem. Supp. 1941, § 4709-1 *et seq.*), an election was·held on May 23, 1942, at which there

was submitted the proposition of forming a new district comprising territory then included in other districts—notably Wheeler district No. 152 and Moses Lake district No. 159.

The result of the election was seventy votes for and thirty-nine against the proposal. However, in the Wheeler district, the vote was three for and thirty-two against the proposal. It is to be noted, therefore, that the result of the election, as a whole, is to bring the Wheeler school district into the proposed new district against the expressed will of its electorate. As a further consequence of the election, the Wheeler school district No. 152 will cease to exist as a municipal entity. All of its property will become the property of the proposed new district. Four thousand dollars on hand in its general fund will become an asset of the new district and used, together with twelve thousand dollars in the general fund of Moses Lake school district No. 159, "to meet current operating expenses incident to the education of all pupils residing within the boundaries of said proposed new district."

That the election and the proceedings leading up to it were had in compliance with the provisions of the Laws of 1941, chapter 248, is not questioned. Plaintiffs rest their causes wholly upon constitutional grounds. They assert that the act is unconstitutional in that (1) it grants special privileges and immunities in violation of Art. I, § 12, of the state constitution; (2) it deprives them of property without due process of law in violation of Art. I, § 3; (3) it is a special law contravening Art. II, § 28, subd. 15, providing for management of common schools; (4) it constitutes an unlawful delegation of legislative power in violation of Art. II, § 1; and (5) it violates Art. I, § 32, in that it contravenes the principles of local self-government.

The trial court held the act unconstitutional and entered decrees enjoining defendant from organizing

and establishing the proposed new district. Defendant appeals.

In the absence of specific constitutional inhibition, the legislature has plenary power over municipal corporations. In 1 Dillon on Municipal Corporations (5th ed.), p. 617, §§ 355, 357, the power is described as follows:

"Not only may the legislature originally fix the limits of the corporation, but *it may, unless specially restrained in the Constitution, subsequently annex,* or authorize the annexation of, contiguous or *other territory, and this without the consent, and even against the remonstrance, of the majority of the persons residing in the corporation or on the annexed territory.* And it is no constitutional objection to the exercise of *this power of compulsory annexation that the property thus brought within the corporate limits will be subject to taxation to discharge a pre-existing municipal indebtedness, since this is a matter which, in the absence of special constitutional restriction, belongs wholly to the legislature to determine. The power to enlarge the boundaries of a municipality* by the annexation of contiguous territory is an incident to the legislative power to create and to abolish municipalities at pleasure; and it is no objection to the exercise of this power, in the absence of constitutional restriction, that the territory annexed to a municipality already has a complete municipal organization as a city, borough, town, or village, or other corporate form recognized by the Constitution and laws of the State. In the absence of constitutional limitation upon the power of the legislature, *it is also no objection to the valid exercise of the power that a smaller municipality is, in practical effect, merged in and consolidated with a larger municipality by the act of the voters of the larger city, as where the question of consolidation is referred to a popular vote of the electors of the consolidated territory,* a provision which almost of necessity refers the question to the practical determination of the electors of the larger of the two bodies intended to be consolidated. A consolidation so effected, unless prohibited by some express provision of the Constitution of the State, is not open to attack as depriving the

taxpayers and electors of the smaller municipality of their vested rights or property without due process of law, either under the constitutional provision to that effect to be found in the Constitution of the State, or the similar provision to be found in the Constitution of the United States.

". . . The legislature may, in the absence of constitutional restriction, dissolve a county, city, or town, and incorporate its territory and inhabitants in new political organizations or divisions. If a municipal corporation goes out of existence by being annexed to or merged in another corporation, and if no legislative provision is made respecting the property and liabilities of the corporation which ceases to exist, the corporation to which it is annexed, or in which it is merged, is entitled to all its property and is answerable for all its liabilities. Where a municipal or public corporation is *legislated out of existence and its territory annexed to other corporations,* the latter, unless the legislature otherwise provides, are *entitled to its property,* and severally liable for a proportionate share of its then subsisting legal debts, and vested with the power to raise revenue wherewith to pay them by levying taxes upon the property transferred and the persons residing therein." (Italics partly ours.)

And in volume one of Cooley's Constitutional Limitations (8th ed.), chapter VIII, p. 393 *et seq.,* we find the following:

"The creation of municipal corporations, and the conferring upon them of certain powers and subjecting them to corresponding duties, does not deprive the legislature of the State of that general control over their citizens which was before possessed. It still has authority to amend their charters, enlarge or diminish their powers, extend or limit their boundaries, consolidate two or more into one, overrule their legislative action whenever it is deemed unwise, impolitic, or unjust, and even abolish them altogether in the legislative discretion, and substitute those which are different. The rights and franchises of such a corporation, being granted for the purposes of government, can never become such vested rights as against the State that they cannot be taken away; nor does the charter con-

stitute a contract in the sense of the constitutional provision which prohibits the obligation of contracts being violated. . . . Restraints on the legislative power of control must be found in the Constitution of the State, or they must rest alone in the legislative discretion. If the legislative action in these cases operates injuriously to the municipalities or to individuals, the remedy is not with the courts. The courts have no power to interfere, and the people must be looked to, to right through the ballot-box all these wrongs."

Similar statements may be found in the encyclopedias: 20 Am. & Eng. Ency. of Law, 1152; 43 C. J., Municipal Corporations, p. 143, § 123; 37 Am. Jur., Municipal Corporations, p. 648, § 30.

*State ex rel. Board of Commissioners v. Clausen,* 95 Wash. 214, 163 Pac. 744, enunciated the principle in the broadest of terms, p. 222:

"As local subdivisions of the state, counties are created by the sovereign power of the state of its own sovereign will without any necessary particular solicitation, consent or concurrent action by the people who inhabit them. They are created by the state under its sovereign and paramount authority with a view to the policy of the state at large, for political organization, and the administration of governmental affairs. With scarcely an exception, all the powers and functions of county organizations have a direct and exclusive reference to the general policy of the state and are, in fact, but a branch of the general administration of that policy. [Citing authorities.] This being so, it would seem to follow as a natural sequence that legislative authority over counties is unlimited except as that limitation is found in the state constitution."

Cases applying the doctrine in other jurisdictions are legion. It will suffice, however, to refer to but one group of cases. It has been noted that the creation of a new district is left to the majority voters within its proposed boundaries. This is a departure, so far as this jurisdiction is concerned, from the usual method of annexing new territory to a municipal corporation. Ordinarily, whether new territory shall

become a part of a municipal corporation is left to the decision of a majority of its inhabitants; otherwise, as in this instance, the inhabitants of the new territory and their property may be subjected to the will and debts of a more populous district. But such, by overwhelming weight of authority, is the legislative prerogative.

That the act permits the Wheeler district and its school assets to be wholly absorbed by the Moses Lake district and subjects the property of its inhabitants to taxation to pay a proportion of the latter's debts, does not violate constitutional inhibitions against the taking of property without due process of law and the granting of special privileges and immunities. *Mount Pleasant v. Beckwith,* 100 U. S. 514, 25 L. Ed. 699; *Kies v. Lowrey,* 199 U. S. 233, 50 L. Ed. 167, 26 S. Ct. 27; *Hunter v. Pittsburgh,* 207 U. S. 161, 52 L. Ed. 152, 28 S. Ct. 40; *In re Pittsburgh's Petition,* 217 Pa. 227, 66 Atl. 348, 120 Am. St. 845; *State ex rel. Meacham v. Preston,* 126 Ohio St. 1, 183 N. E. 777; *Rapp v. Bethel-Tate Consol. School Dist.,* 58 Ohio App. 126, 16 N. E. (2d) 224; *Blake v. Jacks,* 18 Idaho 70, 108 Pac. 534, 138 Am. St. 177, 27 L. R. A. (N.S.) 1147; *Hollister v. Rochester,* 41 Misc. Rep. 559, 85 N. Y. Supp. 147 (affirmed, *In re Hollister,* 180 N. Y. 518, 72 N. E. 1143); *Clother v. Maher,* 15 Neb. 1, 16 N. W. 902; *School Dist. No. 3 v. Callahan,* 237 Wis. 560, 297 N. W. 407, 135 A. L. R. 1081; *White v. Atlanta,* 134 Ga. 532, 68 S. E. 103; *State ex rel. Richart v. Stouffer,* 197 S. W. (Mo.) 248; *State ex rel. Bilby v. Brooks,* 249 S. W. (Mo.) 73; *State ex rel. Consol. School Dist. v. Smith,* 343 Mo. 288, 121 S. W. (2d) 160; *People ex rel. Elder v. Sours,* 31 Colo. 369, 74 Pac. 167, 102 Am. St. 34; *Dowell v. Board of Education,* 185 Okla. 342, 91 P. (2d) 771.

Nor can the act be said to be a special law in contemplation of Art. II, § 28, of the constitution. On the contrary, it is a most comprehensive plan for the reorganization of the common school system, the crea-

tion and maintenance of which is committed to the legislature in the broadest possible terms by Art. IX, § 2, of the constitution, commanding: "The legislature shall provide for a *general and uniform* system of public schools." (Italics ours.) The act is general, and its very purpose is to establish, so far as possible, uniformity in educational opportunity and facilities. *State ex inf. Wright v. Morgan,* 268 Mo. 265, 187 S. W. 54. See *Lewis County v. Gordon,* 20 Wash. 80, 54 Pac. 779; *Bussell v. Gill,* 58 Wash. 468, 108 Pac. 1080; *State ex rel. Hunt v. Tausick,* 64 Wash. 69, 116 Pac. 651.

██ ▪ Respondents argue that the act is a special law because its life expectancy is but four years. However, it is clearly contemplated that its life shall be extended if the plan of reorganization has not been fully worked out in four years. In any case, we do not think that a limitation on the duration of a legislative enactment makes of it a special law in contemplation of Art. II, § 28.

██ Nor do we find any unlawful delegation of legislative power. The act sets up the machinery and fixes the standards by which the county committee and the state committee shall be controlled. It commits no legislative power to them. It simply entrusts to them the administration of the act. *Newman v. Schlarb,* 184 Wash. 147, 50 P. (2d) 36; *State ex rel. Zilisch v. Auer,* 197 Wis. 284, 221 N. W. 860, 223 N. W. 123; *Dowell v. Board of Education, supra; People v. Camargo Community Consol. School Dist.,* 313 Ill. 321, 145 N. E. 154; *People ex rel. Board of Education v. Board of Education,* 380 Ill. 311, 43 N. E. (2d) 1012; *Gardner v. Ginther,* 232 App. Div. 296, 250 N. Y. Supp. 176; *State ex rel. Ramsey v. Lamont,* 105 Kans. 134, 181 Pac. 617. See, also, *State ex rel. Washington Toll Bridge Authority v. Yelle,* 195 Wash. 636, 82 P. (2d) 120; *Carstens v. DeSellem,* 82 Wash. 643, 144 Pac. 934.

██ ██ It is urged that the act contravenes Art. I, § 32, of the constitution, which provides: "A frequent

recurrence to fundamental principles is essential to the security of individual rights, and the perpetuity of free government."

This is not in any sense an inhibition on legislative power. Clearly, it is but an admonition not only to the legislature but also to the courts to keep constantly in mind the fundamentals of our republican form of government—among others, the cleavage between the legislative and the judicial powers. It is thought, however, that the clause warrants the court in holding the act unconstitutional on the theory that it is violative of the principles of local self-government.

It is difficult to conceive an act in which the principles of local self-government could be more meticulously observed. The formation of the county committee—the fountain head of the powers conferred—rests in the electors through their representatives, the boards of school directors in the various districts of the county. (The state committee is nothing more than an advisory board—a board of review. It has no coercive power.) The county committee must hold public hearings before adopting a plan; and, when adopted, the reorganization plan must be submitted to the electorate of the proposed new district and abide the will of a majority of the voters. Finally, recourse to the courts is provided to review the "adjustment of property, debts, and liabilities among the districts involved." Even conceding Art. I, § 32, as a restraint on legislative power, we do not think the act could be said to contravene it. See *State ex rel. Meacham v. Preston, supra.*

Respondents complain that the question of assumption by the proposed new district of the bonded indebtedness of the Moses Lake district was submitted to the voters at the special election. In view of the state of the record, we must assume that it was submitted to the voters as a separate question in accord with the reorganization plan adopted by the county committee as approved by the state committee; in any event, what-

ever complaint respondents may have had on that score should have been submitted to the court under § 16 of the act.

We conclude that the act is a valid exercise of legislative power. The decrees are reversed, and the causes are remanded with directions to dismiss the actions.

SIMPSON, C. J., BEALS, STEINERT, ROBINSON, JEFFERS, MALLERY, and GRADY, JJ., concur.

MILLARD, J. (concurring)—I reluctantly follow precedent authority and concur in majority opinion.

